JACOB STRADER, JAMES GORMAN, AND JOHN ARMSTRONG, PLAINTIFFS IN ERROR, v. CHRISTOPHER GRAHAM.

Under the 25th section of the Judiciary Act, this court has no jurisdiction over the following question, viz. "Whether slaves who had been permitted by their master to pass occasionally from Kentucky into Ohio acquired thereby a right to freedom after their return to Kentucky?" The laws of Kentucky alone could decide upon the domestic and social condition of the persons domiciled within its territory, except so far as the powers of the States in this respect are restrained or duties and obligations imposed upon them by the Constitution of the United States.

There is nothing in the Constitution of the United States that can in any degree control the law of Kentucky upon this subject.

The Ordinance of 1787 cannot confer jurisdiction upon this court. It was itself superseded by the adoption of the Constitution of the United States, which placed all the States of the Union upon a perfect equality, which they would not be if the Ordinance continued to be in force after its adoption.

Such of the provisions of the Ordinance as are yet in force owed their validity to

acts· of Congress passed under the present Constitution, during the Territorial government of the Northwest Territory, and since to the constitutions, and laws of the States formed in it.

IN error to the Court of Appeals for the State of Kentucky.

The defendant in error, who was a citizen of Kentucky, filed his bill in the Louisville Chancery Court, against Jacob Strader and James Gorman, who were citizens of Ohio, and owners of the steamboat Pike, which plied between Louisville, Kentucky, and Cincinnati, Ohio, and John Armstrong, who was the captain of said steamboat.

The bill alleged that the complainant was the owner of three negro slaves, George, Henry, and Reuben, of the value of about fifteen hundred dollars each, who had left his residence at Harrodsburg, Kentucky, and made their way to Louisville, whence they were taken on board of said steamboat Pike, and carried to Cincinnati, from which place they escaped to Canada, and were lost to their owner. Complainant averred that he had a lien on said boat by reason of the asportation of said slaves, for the damages he had sustained, and prayed an attachment and sale of said boat, and general relief.

An attachment was ordered and served, but the boat was relieved upon bond being given to perform all orders of the court, or to have the boat forthcoming.

Two of the defendants in the court below (Strader and Gorman), in their answer, stated that they were not on board the boat at the time of the alleged transportation, had no knowledge of such transportation, and they therefore denied it. They alleged that the boat was under the command of the defendant Armstrong, her captain, and that the negroes in question had been permitted by the complainant to travel out of the Commonwealth as if free; and in an amended answer, they averred that, long before the alleged transportation, the said negroes had actually become free. The answer of Armstrong was substantially to the same effect. There were various proceedings had in the State courts, the case having been twice carried to the Court of Appeals, when Graham finally succeeded in obtaining a decree in the Louisville Chancery Court for $ 3,000 damages, to be paid before a day named, or the boat, her furniture, tackle, &c., to be sold if forthcoming, and if not forthcoming, the court to make the necessary order against the obligors, in said forthcoming bond; which decree was affirmed by the Court of Appeals. To reverse the decree of affirmance, this writ of error was sued out.

By the statute of Kentucky approved 7th January, 1824, any master or commander of a steamboat or other vessel, who shall hire or employ, or take as passengers on board of such

steamboat or other vessel, or suffer it to be done, or otherwise take out of the limits of the Commonwealth, any slave or slaves, without permission of the master of such slave or slaves, shall be liable to damages to the party aggrieved by such removal; and the steamboat or other vessel on board of which such offence was committed shall be liable, and may be proceeded against in chancery, and may be condemned and sold to pay such damages and costs of suit.

The amended act, approved 12th February, 1828, extends the remedies given by the former act, so as to embrace the owners, mate, clerk, pilot, and engineer, as well as the master, and they are declared to be liable to the action of the party aggrieved, " either jointly with the masters, or severally, and either at law or in chancery."

It appeared in evidence, that the negroes were the slaves of Graham, and that they were musicians; that, for their improvement in music, two of them were placed under the care of one Williams, who was a skilful performer and leader of a band, and were permitted to go with him to Louisville, and other places, and play with him at public entertainments. The following permit was filed as an exhibit, and proved.

                          " *Harrodsburg, August 30th,* 1837.

" This is to give liberty to my boys, Henry and Reuben, to go to Louisville, with Williams, and to play with him till I may wish to call them home. Should Williams find it his interest to take them to Cincinnati, New Albany, or any part of the South, even so far as New Orleans, he is at liberty to do so. I receive no compensation for their services, except that he is to board and clothe them.

" My object is to have them well trained in music. They are young, one 17 and the other 19 years of age. They are both of good disposition and strictly honest, and such is my confidence in them, that I have no fear that they will ever [act] knowingly wrong, or put me to trouble. They are slaves for life, and I paid for them an unusual sum; they have been faithful, hard-working servants, and I have no fear but that they will always be true to their duty, no matter in what situation they may be placed.                    C. GRAHAM, M. D.

" P. S. Should they not attend properly to their music, or disobey Williams, he is not only at liberty, but requested, to bring them directly home.                    C. GRAHAM."

Under this permission, Williams, in the year 1837, made several excursions with his band, including the slaves Reuben and Henry, to Cincinnati, Ohio, and New Albany and Madison,

Indiana, for the purpose of playing at balls or public entertainments; after which he returned to Louisville, his place of residence, said slaves returning with him; from which time to the time of their escape in 1841, they had remained within the State of Kentucky.

The case was argued by *Mr. Jones*, for the plaintiffs in error, and *Mr. Crittenden*, Attorney-General, for the defendants in error.

*Mr. Jones*, for the plaintiffs in error.

The owner of the slaves in question placed them under the care of a person to learn music, who carried them out of the State of Kentucky into an adjoining free State to play at balls and parties for hire. As soon, then, as they touched the soil of Indiana or Ohio, with the consent of their master, the quality of freedom attached to their persons, and could never afterwards be dissociated from them; and it made no difference whether they went permanently, or as mere temporary sojourners. There was no distinction, either in reason or in law, to be drawn from the mere duration of commorancy, if the removal to a free State was voluntary on the part of the slave and with the permission of the master. The Ordinance of 1787 declares that neither slavery nor involuntary servitude shall exist in the Northwest Territory. The laws of Ohio and Indiana only reiterate the provisions of that Ordinance. The instant, therefore, the slave came within the boundaries of such States, the laws of those States took effect upon his condition, and *eo instanti* he became clothed with every attribute of freedom.

*Mr. Jones* concluded the opening argument by reading from the brief of *Mr. Duncan*, filed in the case, as follows:—

The Ordinance of 1787 was made after Somerset's case, and after several of our States had passed laws, whose object was to put an end to slavery within their jurisdictions, by operating on the *post nati*. It has been claimed to be a solemn compact, as well as an ordinance. Its provisions are as broad and comprehensive as they could be made, inhibiting slavery and involuntary servitude, except for crime, within the Northwest Territory.

That the courts of Kentucky are bound to take notice of this Ordinance, and to know judicially that slavery is forbidden in this Northwest Territory, are propositions long since settled by the Appellate Court of Kentucky. See Rankin *v.* Lydia, 2 A. K. Marshall, 467.

When Ohio and Indiana were permitted to make their constitutions, and were admitted into the Union by acts of Congress, the courts of Kentucky were still bound to know, judi-

cially, that slavery was prohibited there by the fundamental law of each of those States. It will not be forgotten, that all this Territory and Kentucky were component parts of Virginia when the Ordinance was made.

By force of the Ordinance and of the Constitution of the United States, and the acts of Congress for the admission of Ohio and Indiana as States, those States stand as to the subject of slavery like England, excepting only the cases provided for by the Constitution of the United States, and fairly embraced within its provisions.

For national purposes, all of our States are governed by the same laws, and constitute one government; for other purposes, they are separate and independent sovereignties, with laws and institutions altogether different. 2 Peters, 590. And with respect to their municipal regulations the several States are to each other foreign. 2 Wash. 298. Slavery has been decided to be local, and to depend upon the local law. Somerset's case, State Trials; 1 Lofft, 1; 3 A. K. Marshall, 470 – 472; 3 Bos. & Pull. 69; 2 Barn. & Cress. 448; 2 Martin, N. S. 403.

In the case last cited, Lunsford *v.* Coquillon, the Supreme Court of Louisiana decided, that by removing a slave to Ohio that slave became instantly free by operation of law, and being once free there, the slave was free everywhere. The case of Rankin *v.* Lydia, above cited, maintains substantially the same propositions.

The case of Elizabeth Thomas *v.* Generis, &c., 16 La. Rep. presented these facts. The slave was sent from Kentucky to Illinois, to be put under the charge of an eminent physician, during the absence of the owner. But this was done under circumstances to warrant the inference that the owner consented to the slave residing there. The Supreme Court of Louisiana on such facts say (p. 488), — " If the plaintiff resided in Illinois with the express or implied consent, and with the knowledge and tacit authorization, of her former master, she was under no obligation to serve him there. The bond of slavery once dissolved cannot be renewed by a subsequent removal of a slave so circumstanced into a slaveholding State." 5 Leigh, 615; 10 Leigh, 697; 9 Gill & Johns. 19.

In the case of Louis *v.* Cabarrus, 7 La. Rep. 172, the converse of the proposition was laid down in these words: — " The residence of a slave in Ohio contrary to the will or without the knowledge of his owner, does not deprive the owner of his property."

In Frank *v.* Powell, 11 La. Rep. 500, the court says, — " The owner must be presumed to consent to emancipation of a slave by his removal to Ohio."

In Smith v. Smith, 13 La. Rep. 444, the court says the fact of a slave being taken to a country where slavery or involuntary servitude is not tolerated, operates on the condition of the slave, and produces immediate emancipation.

In 4 Martin, 385, it said, — " The slave has no will, and cannot give consent to serve in a free State."

In 11 La. Rep. 501, it appeared that the plaintiff was brought or left in Ohio, by the person claiming to be owner, for the purpose of serving an innkeeper until $ 150 was received for his hire. It was there decided that the hiring of a slave for service in a free State operated on the freedom of the slave.

In 9 La. Rep. 474, the court decided, that where a slave was taken into a free State, even temporarily, for any other purpose than a mere passage through such country, such slave would become free, and that freedom once impressed was indelible.

The case of Winney v. Whitesides, 1 Missouri, 334 – 336, formally settled the proposition that the United States had power to purchase the Northwest Territory. It treats the Ordinance as a compact (" assented to the articles of compact "), and as in full force (p. 335), and says (p. 336), — " The sovereign power of the United States has declared that neither slavery nor involuntary servitude shall exist there, and this court thinks that the person who takes his slave into said Territory, and by the length of his residence there indicates an intention of making that place his residence, and that of his slave, does by such residence declare his slave to have become a free man."

The case of Lagrange v. Choteau, 2 Missouri Rep., decides that any sort of residence, continued or permitted by the legal owner, to defeat or evade the Ordinance, and thereby introduce slavery de facto, would doubtless entitle a slave to freedom. This case also says the Ordinance was intended as fundamental law.

The case of Ralph v. Duncan, 3 Missouri, 140, says, — " The object of the Ordinance of 1787 was to prohibit the introduction of slaves into the Territory, of which the present State of Illinois constitutes a part, and the master who permits his slave to go there to hire himself offends against that law as much as one who takes his slave along with himself to reside there, and if we are at liberty to regard the moral effect of the act, it is much more to permit the slave to go there to hire himself to labor, than for the master to take him along with himself to reside," &c. 3 Martin, N. S. 699.

In the case of Julia v. McKinney, 3 Missouri, 196, the court said, — " Here was a hiring of a person bound to labor in Ken-

tucky, whilst in Kentucky, brought into Illinois (not to reside there, say if you will), and hired to labor for one or two days by the owner. What difference can it make if the hiring had been, for one hundred days? We can see none, except in the degree or quantity of time."

The court is referred also to Stewart *v.* Oakes, 5 Harr. & Johns. 107, note; also to 3 Harr. & Johns. 491, 493; 3 Mon. 104; 5 Littell, 285; 1 Va. Rep. by Gilmer, 143; and many other cases might be cited from the decisions of the courts of last resort in the States where slavery exists, to show that the principles contained in the cases cited are generally recognized.

In all these cases, it is believed the length of residence was considered immaterial. The fact that the slave was taken or permitted to reside, or hired, or sent to labor, where slavery was forbidden, determined the right to freedom.

The grand object and settled policy of the Ordinance would be evaded and defeated, if citizens of Ohio or Indiana could hire slaves in Virginia and Kentucky to cultivate their farms. If they could thus hire for a day, or a month, or a year, they could do so for any number of years. It would be no answer to say the master resided in a slave State, contracted in a slave State, and never intended to change the permanent residence of his slave.

The proposition is maintained, that if a master voluntarily hire his slave to a citizen of a non-slaveholding State, to perform service and labor in such non-slaveholding State, and if he in fact send the slave there for that purpose, the slave becomes free.

There is no principle of comity which requires any sovereignty to surrender the interest of its citizens, or its established laws, or its settled policy, in deference to or respect for any foreign law. If the non-slaveholding States, out of comity, would allow citizens of slaveholding States to cultivate their soil with their slaves, they would soon be converted into slaveholding States. If the citizens of non-slaveholding States could themselves introduce slaves under contracts of hire, they would violate the settled policy of their State by bringing slave labor in competition with their poor. 16 Pet. 539; 2 McLean, 596.

When Connecticut passed her law to provide for the eradication of slavery, she began it with a preamble which declared in concise terms the reason and policy of the law to be, " that slavery is inconvenient and injurious to the poor."

The defendant in error, by express written authority, gave Williams authority to take the slaves to Indiana and to Ohio, to serve him, Williams, in those States. This was done upon a consideration which the master deemed adequate. Under

that express written authority of the master, they were so taken, again and again, to those States, to perform service for pay. Now this either did or did not make them free. If it did make them free, it was either by virtue of the Ordinance, or of the Constitution or laws of the United States admitting those States under that Ordinance with constitutions prohibiting slavery. The defence of Strader, &c., turned on the giving, or refusing to give, validity to the Ordinance or acts of Congress. A State court has decided against that defence, — and this is claimed to be one of the very cases in which jurisdiction is given to this court under the twenty-fifth section of the Judiciary Act. Pollard v. Kibbe, 14 Pet. 417.

*Mr. Crittenden, contra.* Much argument has been urged to show, that, in regard to the operation of the Ordinance of 1787 and the laws of Ohio and Indiana upon the condition of slaves brought into those States with the consent of their masters, there is no difference between a temporary and a permanent residence. But in this case there was no residence at all. It was only a transient visit to Madison for part of one night, and for a fleeting and temporary purpose. Williams's residence was in Louisville. There was no change of domicile, nor was there the most remote intention of such change. The slaves accompanied Williams in his short visit, and voluntarily returned with him to Kentucky; and it was not till some four years after their return to their master that they made their escape. A distinction is attempted between a temporary residence and a visit *in transitu.* There is no foundation for such a distinction. The only legal distinction is that of domicile and transient residence, or stoppage *in itinere.*

But the important fact in this case is the voluntary return of the slave to his master. The question, then, is, What is the condition of the slave on his return, by the laws of Kentucky? not what was his condition by the laws of Indiana or Ohio, when within the limits of those States. This is a question purely of local law, to be decided by the local courts. The laws of Kentucky could alone determine the *status* or condition of persons residing within the State, and the courts of the State were the appropriate expounders of those laws. This court has, consequently, no jurisdiction to reverse or review the decision of the Court of Appeals in this case. It does not arise under any act of Congress. It does not arise even under the Ordinance of 1787. If the slaves had sued for their freedom, it might have been brought under the Ordinance. It is simply a case arising under the statute law of Kentucky. Owens v. Norwood's Lessee, 5 Cranch, 344.

8 *

What have the Supreme Court of Kentucky decided? They have decided that there was *no* residence, that there was a *temporary* visit for a *temporary* purpose; and that such a visit, followed by a voluntary return to their master, gave no title to freedom under the Ordinance of 1787. The Ordinance of 1787 declares that there shall be no involuntary servitude northwest of the Ohio. It says nothing of the effect of a mere temporary sojourn of a slave in that Territory with the consent of his master, and a voluntary return to the State from which he came. The Ordinance was founded in wise counsels, for large purposes, and has been faithfully kept. It was not to catch up a wandering fiddler, as in this case, upon a mere visit for playing at a ball, that the Ordinance of 1787 was passed. It degrades the character of that Ordinance to suppose so. It would give to it the effect of creating a border warfare, instead of cultivating the courtesies and amenities of life.

If, however, that decree be examinable in this court, it will be further insisted, —

1st. That under the circumstances of this case, the transient excursion of the slaves in question to Cincinnati, for a temporary purpose, with intention to return, and within their actual obligations to the service of their master, conferred no right to freedom after such voluntary return, either under the Ordinance, or under the Constitution or laws of the United States.

Judge Story, in his Conflict of Laws, § 96, on the question of a voluntary return to slavery, considers the law to be that the slave acquires no right to freedom. In the case of the Commonwealth of Massachusetts v. Aves, 18 Pick. 193, the court in Massachusetts decide that a slave who has been in a free State, but returns voluntarily to the State from which he came, returns to the condition in which he was when he left. He waives his right to freedom by his voluntary return. And so did Sir William Scott decide, in 2 Haggard's Admiralty Reports, 94. And the court of Kentucky decide the same thing.

2d. That the plain 'ffs in error have no right thus collaterally to make any defenc or question as to the claims of those slaves to their freedom, claims which they themselves had apparently abandoned, and which they certainly never asserted. Their right, if any, was personal, and cannot be revived and brought into litigation, as attempted in this case by the plaintiffs in error.

I suppose it is very clear that the only question here is, whether this decision conflicts with the Ordinance of 1787. It may conflict with the law of Ohio, or Indiana, or the constitution of Ohio or Indiana; but that confers no jurisdiction on this court.

If the doctrine maintained on the other side be established, the Ohio will be made like the fabled Styx, the river of death, which, if once crossed, can never be recrossed. It will destroy that amenity of intercourse, that interchange of social courtesies, which now exist, and which do so much to preserve those kindly and fraternal feelings upon which the success of our institutions so much depends. He trusted in the wisdom of the court to arrive at such a decision as should be acquiesced in by all.

*Mr. Jones*, in reply and conclusion.

The defence is, that these slaves having once had the indelible character of freedom stamped on them by a residence, sojourn, or commorancy within the Territory over which the Ordinance of 1787 extended, it could never afterwards be obliterated.

The penalty or forfeiture is for transporting slaves, and it is a necessary prerequisite that the *status* of slavery should be established.

Suppose a slave emancipated, and I am indicted for dealing with him, a slave, can I not set up a defence that the condition of slavery did not exist under the Ordinance of 1787? And did not the court of Kentucky in this case decide upon the effect of the Ordinance of 1787?

It is agreed that this case arises under the laws of Kentucky. But Kentucky could not pass laws inconsistent with the Ordinance. They cannot make a slave of one whom the Ordinance makes free. All that Kentucky has done has been to apply the penalty to the asportation of *slaves*. The question, then, is, Bond or free?

It is decided as to the condition of slavery in those States where it is not recognized, that there is no obligation under common law, in the national law, or the comity of nations, to recognize it where the slave is brought into such State voluntarily. Then, as to the permanence of the removal, all the authorities concur, that no matter how temporary the purpose, if the slave be brought or sent by the master for ever so short a time, once there, *eo instanti* he becomes free. Some State courts have distinguished between slaves temporarily employed and slaves *in transitu*.

This is illustrated by the acts of coterminous slave States. Maryland and Virginia were obliged to pass laws to prevent freedom from resulting from a temporary residence.

What is the difference between temporary and permanent residence? *Animus morandi* and *animus revertendi*.

The only true distinction is between domicile, on the one

hand, and mere residence, whether for a short or for a long time, on the other. Various words have been applied to express the idea, such as *sojourning, commorancy, residence,* &c. Many persons pass their whole lives in a strange land. The Israelites sojourned in Egypt for four hundred years; yet it was not their home. It is true that in the case in 2 Martin, the slave was removed into Indiana for a permanent residence, and the court seem to indicate a distinction between a permanent and temporary residence; but it was only incidentally laid down, and has been overruled in Louisiana since. In the case in 18 Pickering, the slave was a mere attendant *in itinere,* and the decision was, that even that conferred freedom. In fact, the States of Kentucky, Louisiana, and Missouri concur (with the exception of persons *in itinere*) with the courts of the Northern States as to the effect of residence. And the length of residence was immaterial. There are two cases in Louisiana where slaves were taken to France and brought back again, which entirely abolish all distinction between one sort of residence and another.

The case of the slave Grace has been referred to, where the right to freedom, which might have been asserted, was considered as waived by a return to the place of slavery. But does that construction of law as existing in England apply here? It is a monstrosity in morals and in law, that a man who has been made free by the operation of law can make himself a slave. On the coming of the slave into the free State, by the mere force of the prohibition, his shackles fall from him. Are they ever to be restored? By what law? If he be free in Ohio and Indiana, how shall he be a slave elsewhere? What power of man is to redintegrate that condition? Nor is there any real distinction as to right of dominion and right of property. If the slave be made free, there can be no right of property in his service. Where is the law which makes a distinction between the right of property *quoad* the State, and an absolute divestiture of all right of property by operating on the *status* of slavery? It cannot be said that the slave is free, and yet that my right of property remains intact.

Mr. Chief Justice TANEY delivered the opinion of the court.

This case is brought here by writ of error directed to the Court of Appeals of the State of Kentucky.

The facts in the case, so far as they are material to the decision of this court, are briefly as follows. The defendant in error is a citizen of the State of Kentucky, and three negro men whom he claimed and held as his slaves were received on board the steamboat Pike, at Louisville, without his knowledge

or consent, and transported to Cincinnati; and from that pláee escaped to Canada, and were finally lost to him.

The proceedings before us were instituted under a statute of Kentucky, in the Louisville Chancery Court, against the plaintiffs in error, to recover the value of the slaves which had thus escaped, and, in default of payment by them, to charge the boat itself with the damages sustained. Strader and Gorman were the owners of the boat, and Armstrong the master.

The plaintiffs in error, among other defences, insisted that the negroes claimed as slaves were free; averring that, some time before they were taken on board the steamboat, they had been sent, by the permission of the defendant in error, to the State of Ohio, to perform service as slaves; and that, in consequence thereof, they had acquired their freedom, and were free when received on board the boat.

It appears by the evidence, that these men were musicians, and had gone to Ohio, on one or more occasions, to perform at public entertainments; that they had been taken there for this purpose, with the permission of the defendant in error, by a man by the name of Williams, under whose care and direction he had for a time placed them; that they had always returned to Kentucky as soon as this brief service was over; and for the two years preceding their escape, they had not left the State of Kentucky, and had remained there in the service of the defendant in error, as their lawful owner.

The Louisville Chancery Court finally decided, that the negroes in question were his slaves; and that he was entitled to recover $ 3,000 for his damages. And if that sum was not paid by a certain day specified in the decree, it directed that the steamboat should be sold for the purpose of raising it, together with the costs of suit. This decree was afterwards affirmed in the Court of Appeals of Kentucky, and the case is brought here by writ of error upon that judgment.

Much of the argument on the part of the plaintiffs in error has been offered for the purpose of showing that the judgment of the State court was erroneous in deciding that these negroes were slaves. And it is insisted that their previous employment in Ohio had made them free when they returned to Kentucky.

But this question is not before us. Every State has an undoubted right to determine the *status*, or domestic and social condition, of the persons domiciled within its territory; except in so far as the powers of the States in this respect are restrained, or duties and obligations imposed upon them, by the Constitution of the United States. There is nothing in the Constitution of the United States that can in any degree con-

trol the law of Kentucky upon this subject. And the condition of the negroes, therefore, as to freedom or slavery, after their return, depended altogether upon the laws of that State, and could not be influenced by the laws of Ohio. It was exclusively in the power of Kentucky to determine for itself whether their employment in another State should or should not make them free on their return. The Court of Appeals have determined, that by the laws of the State they continued to be slaves. And their judgment upon this point is, upon this writ of error, conclusive upon this court, and we have no jurisdiction over it.

But it seems to be supposed in the argument, that the law of Ohio upon this subject has some peculiar force by virtue of the Ordinance of 1787, for the government of the Northwestern Territory, Ohio being one of the States carved out of it.

One of the articles of this Ordinance provides, that "there shall be neither slavery nor involuntary servitude in the said Territory, otherwise than in punishment for crimes whereof the party shall have been duly convicted: Provided always, that any person escaping into the same, from whom labor or service is lawfully claimed in any one of the original States, such fugitive may be lawfully reclaimed and conveyed to the person claiming his or her labor or service as aforesaid." And this article is one of the six which the Ordinance declares shall be a compact between the original States and the people and States in the said Territory, and for ever remain unalterable unless by common consent.

The argument assumes that the six articles which that Ordinance declares to be perpetual are still in force in the States since formed within the Territory, and admitted into the Union.

If this proposition could be maintained, it would not alter the question. For the regulations of Congress, under the old Confederation or the present Constitution, for the government of a particular territory, could have no force beyond its limits. It certainly could not restrict the power of the States within their respective territories; nor in any manner interfere with their laws and institutions; nor give this court any control over them. The Ordinance in question, if still in force, could have no more operation than the laws of Ohio in the State of Kentucky, and could not influence the decision upon the rights of the master or the slaves in that State, nor give this court jurisdiction upon the subject.

But it has been settled by judicial decision in this court, that this Ordinance is not in force.

The case of Permoli v. The First Municipality, 3 How. 589, depended upon the same principles with the case before us. It

is true that the question in that case arose in Louisiana. But the act of Congress of April 7, 1798, chap. 28 (1 Stat. at Large, 549), extended the Ordinance of 1787 to the then Territory of Mississippi, with the exception of the antislavery clause; and declared that the people of that Territory should be entitled to and enjoy all the rights, privileges, and advantages granted to the people of the Territory Northwest of the Ohio. And by the act of March 2, 1805, chap. 23 (2 Stat. at Large, 322), it was enacted that the inhabitants of the then Territory of Orleans should be entitled to and enjoy all the rights, privileges, and advantages secured by the Ordinance of 1787, and at that time enjoyed by the people of the Mississippi Territory.

In the case above mentioned, Permoli claimed the protection of the clause in one of the six articles which provides for the freedom of religion, alleging that it had been violated by the First Municipality. And he brought the question before this court, upon the ground that it had jurisdiction under the Ordinance. But the court held that the Ordinance ceased to be in force when Louisiana became a State, and dismissed the case for want of jurisdiction. This opinion is, indeed, confined to the Territory in which the case arose. But it is evident that the Ordinance cannot be in force in the States formed in the Northwestern Territory, and at the same time not in force in the States formed in the Southwestern Territory, to which it was extended by the present government. For the ordinances and pledges of the Congress of the old Confederation cannot be more enduring and obligatory than those of the new government; nor can there be any reason for giving a different interpretation to the same words used in similar instruments, because the one is by the old Confederation and the other by the present government. And when it is decided that this Ordinance is not in force in Louisiana, it follows that it cannot be in force in Ohio.

But the whole question upon the Ordinance of 1787, and the acts of Congress extending it to other territory afterwards acquired, was carefully considered in Pollard *v.* Hagan, 3 How. 212. The subject is fully examined in the opinion pronounced in that case, with which we concur; and it is sufficient now to refer to the reasoning and principles by which that judgment is maintained, without entering again upon a full examination of the question.

Indeed, it is impossible to look at the six articles which are supposed, in the argument, to be still in force, without seeing at once that many of the provisions contained in them are inconsistent with the present Constitution. And if they could be regarded as yet in operation in the States formed within the

limits of the Northwestern Territory, it would place them in an inferior condition as compared with the other States, and subject their domestic institutions and municipal regulations to the constant supervision and control of this court. The Constitution was, in the language of the Ordinance, "adopted by common consent," and the people of the Territories must necessarily be regarded as parties to it, and bound by it, and entitled to its benefits, as well as the people of the then existing States. It became the supreme law throughout the United States. And so far as any obligations of good faith had been previously incurred by the Ordinance, they were faithfully carried into execution by the power and authority of the new government.

In fact, when the Constitution was adopted, the settlement of that vast territory was hardly begun; and the people who filled it, and formed the great and populous States that now cover it, became inhabitants of the territory after the Constitution was adopted; and migrated upon the faith that its protection and benefits would be extended to them, and that they would in due time, according to its provisions and spirit, be admitted into the Union upon an equal footing with the old States. For the new government secured to them all the public rights of navigation and commerce which the Ordinance did or could provide for; and moreover extended to them when they should become States much greater power over their municipal regulations and domestic concerns than the Confederation had agreed to concede. The six articles, said to be perpetual as a compact, are, not made a part of the new Constitution. They certainly are not superior and paramount to the Constitution, and cannot confer power and jurisdiction upon this court. The whole judicial authority of the courts of the United States is derived from the Constitution itself, and the laws made under it.

It is undoubtedly true, that most of the material provisions and principles of these six articles, not inconsistent with the Constitution of the United States, have been the established law within this territory ever since the Ordinance was passed; and hence the Ordinance itself is sometimes spoken of as still in force. But these provisions owed their legal validity and force, after the Constitution was adopted and while the territorial government continued, to the act of Congress of August 7, 1789, which adopted and continued the Ordinance of 1787, and carried its provisions into execution, with some modifications, which were necessary to adapt its form of government to the new Constitution. And in the States since formed in the territory, these provisions, so far as they have been preserved, owe their validity and authority to the Constitution of the

United States, and the constitutions and laws of the respective States, and not to the authority of the Ordinance of the old Confederation. As we have already said, it ceased to be in force upon the adoption of the Constitution, and cannot now be the source of jurisdiction of any description in this court.

In every view of the subject, therefore, this court has no jurisdiction of the case, and the writ of error must on that ground be dismissed.

Mr. Justice McLEAN.

I agree that there is no jurisdiction in this case, and that it must be dismissed.

The plaintiffs obtained this writ of error to reverse a judgment of the Court of Appeals of Kentucky, which affirmed the judgment of the inferior court, in which Graham obtained a verdict and judgment against the defendants below for three thousand dollars, on the ground that three of the servants of the plaintiff had been conveyed from Louisville, Kentucky, to Cincinnati, in the steamboat of defendants, by which means they escaped, and the plaintiff lost their services.

The defendants set up in their defence the Ordinance of 1787, for the government of the Northwestern Territory, which prohibited slavery in the sixth article of the compact, and which was declared " to be unalterable unless by common consent." The defendants alleged that, with the permission of Graham, the slaves had been permitted to visit Ohio and Indiana as musicians, by which they were entitled to their freedom; although they had returned voluntarily to their master, in Kentucky. And the right to their freedom was asserted under the Ordinance, which, it is insisted, brings the case within the twenty-fifth section of the Judiciary Act of 1789, and gives jurisdiction to this court.

The provision of the Ordinance in regard to slavery was incorporated into the constitution of Ohio, which received the sanction of Congress when the State was admitted into the Union. The constitution of the State, having thus received the consent of the original parties to the compact, must be considered, in regard to the prohibition of slavery, as substituted for the Ordinance, and consequently all questions of freedom must arise under the constitution, and not under the Ordinance.

This, in my judgment, decides the question of jurisdiction, which is the only question before us. And any thing that is said in the opinion of the court, in relation to the Ordinance, beyond this, is not in the case, and is, consequently, extrajudicial.

Mr. Justice CATRON.

The Ordinance of 1787 provides that the six articles contained in it shall be unalterable, and remain a compact between the original States and the people of the Northwestern Territory, " unless altered by common consent."

1. The sixth article declares, that slavery shall be prohibited. 2. And that absconding slaves there found shall be surrendered to their owners.

The constitution of Ohio incorporates the first part of the sixth article, but leaves out the second part. The State constitution having received the sanction of Congress, the alteration was made by common consent, as this was the mode of consent contemplated by the compact; that is to say, by the States in Congress assembled, whether under the Confederation or present Constitution. This being an " engagement entered into " before the adoption of the Constitution, was equally binding on the one Congress as the other, according to the sixth article of the new Constitution; and the new Congress, equally with the former one, had power to consent to alterations. The power to alter necessarily involves the power to annul, or to suspend; and when the State constitution of Ohio was assented to by Congress, the article stood suspended, or abolished, as an engagement among the States, and can *now* only be recognized as part of the organic State law. And as this law is drawn in question here, no jurisdiction exists to examine the State decision.

But in regard to parts of the other five articles, I am unwilling to express any opinion, as no part of either is in any degree involved in this controversy.

The fourth article secured the free navigation of the waters leading into the rivers Mississippi and St. Lawrence, and the carrying-places between them, as common highways; and exempted them from tax, impost, or duty. The mouths of the two great rivers were in possession of foreign powers, and closed to our commerce, at the date of the Ordinance and Constitution; and therefore it was more necessary that the tributaries should be always open, and the carrying-places free, so that the Ohio and St. Lawrence could be reached from the great lakes, and back and forth either way. Some of these tributary rivers and the carrying-places, it was known, would fall into a single new State, as contemplated by the Ordinance. This is true of every carrying-place, and is equally true as respects most of the rivers leading to the carrying-places; and as Congress had only power given by the new Constitution " to regulate commerce among the States," it is a question now unsettled, whether such inland rivers and carrying-

places could be regulated, where the navigation and carrying-places began and ended in a single State.

For thirty years, the State courts within the territory ceded by Virginia have held this part of the fourth article to be in force, and binding on them respectively; and I feel unwilling to disturb this wholesome course of decision, which is so conservative to the rights of others, in a case where the fourth article is in no wise involved, and when our opinion might be disregarded by the State courts as *obiter*, and a *dictum* uncalled for. When the question arises here on the fourth article, it is desired by me, that no such embarrassment should be imposed on this court as necessarily must be by now passing judgment on the force of the fourth article, and pronouncing that it stand superseded and annulled.

### Order.

This cause came on to be heard on the transcript of the record from the Court of Appeals for the State of Kentucky, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that this cause be, and the same is hereby, dismissed for the want of jurisdiction.