Donahue, J.
The first question presented by the pleadings and briefs of counsel, while one of very great importance, is perhaps easier of solution than any other question in the case. It is claimed on behalf of defendants that a levy of taxes by the general assembly of Ohio for state purposes is subject to the control of the budget commissioners of the several counties of the state. If this be the proper construction of Section 5649-3c, General Code, then it conflicts not only with the provisions of Sections 5625 and 5626, General Code, but it is also in direct conflict with Section 4 of Article XII of the Constitution of the state. Under such construction the state would be dependent upon the various local budget commissioners of the several counties for sufficient revenues to meet its needs. In the very nature of things these local budget commissioners will differ in their judgment, and the tax levy for state purposes will not be uniform throughout the state. Certainly such an absurd *96 condition of affairs was not intended by the general assembly of Ohio, and even if it did so intend, Section 4 of Article XII of the Constitution directs that the general assembly shall provide for the revenues of the state. While it is true that it is the duty of courts to interpret the law as they find it, without reference to whether its provisions be wise or unwise, yet it is also a canon of construction that courts will seek to give to statutes not only a construction that is consistent with the provisions of the constitution (of the state but also such construction as will result in the accomplishment of an intelligent and reasonable purpose rather than a ridiculous and absurd one.
In endeavoring to arrive at a correct interpretation of the language used in Section 5649-3c, we must keep in mind this constitutional provision as well as the legislation in relation to the same subject-matter. Section 4 of Article XII .of the Constitution declares that “The general assembly shall provide for raising revenue, sufficient to defray the expenses of the state.” Section 5625, General Code, provides that “Taxes, for state purposes, shall be levied, annually, on each dollar of valuation of taxable property, in the sum or sums, provided by law.” When the general assembly of the state has provided by lavo for the sum or sums to be levied for state purposes, arid that law has been approved by the governor of this state, no other authority has the power to change or alter the sum or sums provided by law. If the budget commissioners were authorized to change the amount of the levy, either by increasing or decreasing the same, *97 then the levy would not be “in the sum or sums, provided by law,” but in the “sum or sums” provided by the budget commissioners of the several counties. Such a construction would authorize the budget commissioners of a county to repeal an act of the general assembly of the state. The language of Section 5649-3c does not admit of such construction. Section 5626, General Code, provides that the auditor of state shall give notice to each county auditor of the rate required by law for state purposes, and further provides that such rate shall be placed by the county auditor on the tax lists of the county, to be entered by him in one column and denominated by him “state taxes.” The duties of the auditor of state in relation to levies for state purposes provided by law are merely ministerial. The county auditor has no more power or authority in relation to these levies than the auditor of state. Section 5649-3c provides that “The auditor shall lay before the budget commissioners the annual budgets submitted to him by the boards and officers named in Section 5649-3a of this act, together with an estimate to be prepared by the auditor of the amount of money to be raised for state purposes in each taxing district in the county.” By the plain, unambiguous language of this statute the annual budgets submitted by the boards and officers named in Section 5649-3o are something separate and apart from the estimate prepared by the auditor of the amount of money tc be raised for state purposes, and this distinction must be borne in mind; otherwise confusion is likely to arise in the further consideration of this sec *98 tion. When it becomes necessary to do so the budget commissioners “shall reduce the estimates contained in any or all such budgets by such amount or amounts as will bring the total for each township, city * * * or other taxing district, within the limits provided by law.” When the budget commissioners have completed their work they shall certify their action to the county auditor, who shall ascertain the rate of taxes necessary to be levied upon the taxable property of each of the taxing districts and place the same on the tax lists of the county.
Keeping in mind the distinction made in the earlier provisions of this section between “annual budgets” and “estimates * * * for state purposes” it clearly appears that the budget commissioners are authorized to reduce the items in the annual budgets submitted by the boards and officers named in Section 5649-3a, and that they have no authority to reduce the levy certified for state purposes. The reason for requiring the county auditor to inform the budget commissioners as to the amount cff the levy for state purposes is obvious. With this information at hand they are in position to keep the total levy within the limitations provided by law, but the budget commissioners have nothing to do with any state levy, except for the purpose of computation. With this levy for state purposes, provided by Section 1 of the act of the general assembly, passed April 8, 1913 (103 O. L., 155-158), and the amendatory act of April 16, 1913 (103 O. L., 863), which is specifically exempted from the operation of the *99 statutes limiting the amount of taxes that may be levied in any taxing district, these budget commissioners have nothing to do. It does not even enter into their computation. The certifying of this levy to the budget commissioners by the county auditor was an idle performance.
The auditor of Hamilton county should have placed this tax levied by the lawmaking power of the state on the tax lists of that county, unless the law levying the tax is unconstitutional.
It is claimed that this law is unconstitutional because it purports to levy a tax prior to the creation of the object for which the levy is made. It is clearly evident, however, that this act conforms to the provisions of Section 5 of Article XII of the Constitution, which provides that “Every law imposing a tax, shall state, distinctly, the object of the same, to which only, it shall be applied.” The law in question obeys this positive mandate of the constitution of the state and distinctly states the object for which the tax is levied. When that is done the provisions of this section are satisfied. If other provisions of the constitution prevent the sections of an act which distinctly states the object of the tax from going into immediate effect with the sections imposing the tax, that fact cannot be urged against the constitutionality of the law. This section must be construed in relation to all the other provisions of the constitution on the same subject-matter, and, if possible, such a construction given as will further all the intents and purposes of the constitution instead of defeating them.
This question, however, is no longer of serious *100 importance in this case. No petitions were filed with the secretary of state, as provided by Section lc of Article II of the Constitution, requesting the submission of this law, or any part of it, to the electors of the state for their approval or rejection. While some parts of this law were subject to this provision of the constitution, yet after the expiration of ninety days it became a valid and existing law of the state. The law in its entirety was in full force and effect in all its parts at the time the budget commissioners of. Hamilton county filed their report with the auditor and before the auditor had placed or caused to be placed the tax levied for state or local purposes upon the tax lists of the county. It was not necessary to certify this particular levy to the budget commissioners, as they were not required to take this into account in the calculation of the amount of taxes that might be levied for local purposes in any taxing district in the county. It is important that the auditor of state should certify the levy for state purposes coming within the limitations prescribed by law within the time specified in Section 5626, General Code, for the reason that the budget commissioners should be notified at the very beginning of their session of this: amount. His failure to do so, however, would not defeat the tax. It would merely delay the work of the budget commissioners. The neglect of the auditor of state to notify all county auditors of a levy for state purposes, expressly exempt from the limitation prescribed by law, could work no such inconvenience or delay. That is a matter with which the budget commissioners have no concern, *101 and the county auditor is not now required to place this levy upon the tax lists of the county until the report of the budget commissioners is filed in his office. Therefore, if this levy is certified at any time before the report of the budget commissioners is filed in the office of the county auditor, or at any time before the auditor completed his tax lists, it would be in ample time to serve every purpose for which it is intended, and it would be the duty of the county auditor to place the same on the tax lists of the county. It is conceded that this law in all its parts went into effect long before the report of the budget commissioners was filed with the county auditor. Therefore this objection to this levy cannot be sustained.
It is claimed that this act is in conflict with the provisions of Section 22 of Article II, in that it purports to appropriate money for a period longer than two years. This act does nothing of the kind. Like all other laws imposing a tax, it declares the object of the tax, and this is required by Section 5 of Article XII of the Constitution. The duty of appropriating funds so raised to the object declared in the law imposing the tax, and to none other, still devolves upon the general assembly of the state. This fully appears by Section' 7 of the act in question, which provides for the disbursement of the fund “from an appropriation made to carry out the provisions of this chapter.” Without such appropriation the funds cannot be disbursed.
It is the further claim of defendants that this act is unconstitutional because it is contrary to *102 the fundamental principles of local self-government vested in the counties and townships. In support of this claim, counsel invoke the provisions of the Ordinance of 1787, which ordinance recognized counties and townships as existing organizations prior to the creation of the state. Our attention is also called to the fact that the territorial legislature committed to the local authorities the duty of establishing and maintaining public highways. While there is nothing in the provisions of this ordinance with which this legislation in anywise conflicts, yet if there were it would be sufficient to say that' when the constitution of the state of Ohio was adopted and our state admitted by the congress of the United States into the Union, the provisions of the Ordinance of 1787 ceased to be operative in the territory comprised within the limits of this state.
This ordinance provided for the government of this territory while it remained a territory, and it also provided that whenever any of the states included in the territory should have 60,000 free inhabitants, it should be admitted into the Union of the states on an equal footing with the original states in all respects whatever, and should be at liberty to form a permanent constitution and state government. ■
Ohio. did adopt a permanent constitution and state government, and was admitted into the Union. Its relation to the Union then became the same as that of New York, Pennsylvania or any other of the original states. . This ordinance was the product of a wise and masterful statesmanship, *103 and will forever stand as a monument in the march of human progress, but its purposes' were fully accomplished when Ohio adopted a constitution and was admitted into the Union, and this appears by the terms and provisions of the ordinance itself. Each state in the Union stands equal with every other state. All are subject to the constitution of the United States, and no state can claim more privilege nor be denied less than any other of its sister states. The contrary of this proposition would destroy the fundamental principles upon which the federal government is based. However, when Ohio did adopt a constitution, it wrote into that constitution practically every provision of the Ordinance of 1787 applicable to a' state government, particularly all the parts and portions thereof protecting the rights of citizens, guaranteeing civil and religious liberty, providing against special privilege, preserving the right to petition, the right of trial by jury and the right to the writ of habeas corpus, and the prohibition of slavery and involuntary servitude. This Ordinance of 1787 blazed the way for the creation of a state constitution which not only reaffirmed but amplified the declaration of human rights contained in this ordinance. These principles have been maintained and preserved to the present time and are still in force and effect, not because the Ordinance of 1787 is still in force and effect but because these provisions have been rewritten into the constitution of the state, which was designed to and did take its place. If the Ordinance of 1787 were to remain in force after the adoption *104 of this constitution and the admission of Ohio into the Union, then the rewriting of these provisions of the ordinance into the constitution of the state was a useless and unnecessary performance.
It would be just as reasonable to claim that the Articles of Confederation- survived the constitution of the United States as to claim that the provisions of this Ordinance of 1787 for the government of the Northwest Territory survived the adoption of a constitution by the several states within the territory.
The claim that the articles of this ordinance in all its parts, whether applicable to state government or not, must remain binding and obligatory upon the people of this state is in direct conflict with the provisions of Section 1 of Article VIII of the Constitution of 1802 and Section 2 of Article I of the present Constitution, in both of which it is declared that the people of the state shall have at all times a complete power to alter, reform or abolish their government, whenever they may deem it necessary. If this ordinance is a binding and subsisting contract, then these sections of the state constitutions are meaningless, and the people of this state have no such power. The provisions of this ordinance, that the articles therein contained “shall be considered as articles of compact, between the original states and the people and states in the said territory, and forever remain unalterable, unless by common consent,” were fully satisfied by the adoption of a constitution by the people of this state and the acceptance of *105 that constitution by the congress of the United States.
It has been said, however, that the congress of the United States could not give the consent of the original states to the alteration of this, contract, but this contention cannot be sustained by any method of right reasoning. The Articles of Confederation between the thirteen original states were entered into July 9, 1778. On July 13, 1787, the confederate congress passed this ordinance for the government of the territory of the United States northwest of the river Ohio. The constitution of the United States went into effect in March, 1789, and entirely superseded the Articles of Confederation.
When the confederate congress passed this ordinance it was acting for and on behalf of the United States under the authority conferred upon it by the Articles of Confederation, and not for the separate and individual states then constituting the Union. It must be conceded that the confederate congress that adopted this ordinance had full power and authority to enter into this compact on the part of the United States. If it had not ¿such authority then there never was any existing contract between the United States and the people and states of the Northwest Territory. It must also be conceded that the federal congress, after the adoption of the constitution, succeeded to all the power, right and authority vested in the confederate congress, as well as such further authority as was granted by the constitution itself. Among other things, the constitution provided in Section 3 of Article IV that “New states may be *106 admitted by the congress into this Union.” This grant o£ power of course extended to the new states to be formed out of the Northwest Territory, and the original compact provided that these states should be admitted into the Union on equal footing with the original states in all respects whatever. The power given to congress by Section 3 of Article IV of the Constitution did not authorize it to impose any conditions upon the states so admitted other than the conditions of the federal constitution, operating alike on all the states. The confederate congress having full power and authority to adopt this ordinance and enter into this compact on the part of the United States, as then constituted, and the federal congress succeeding to all the rights and authority of the confederate congress and being specifically authorized by the constitution itself to admit states into the Union, it follows that the congress of the United States had full, ample and complete power to act on behalf of the federal government, and it was not requisite to the alteration of this compact that the separate and several original states should separately and severally consent thereto.
If, however, it were conceded that this language means that the consent of the several original states must first be obtained directly from the states themselves before any alteration could be made in this compact, that provision would have no application beyond the life of the contract itself; that is to say, that if during the territorial government established under this ordinance a change of contract was desired, then all parties thereto must consent before any alterations there *107 of could be made, but the further articles of this ordinance provide for the termination of the contract itself, and when these conditions for its termination were complied with, the contract determined and all parties thereto were released from the obligations thereof. This provision for the termination of the ordinance is found in the article providing for the admission of the states carved out of this territory into the ‘Union on an equal footing with the original states in all respects whatever. This provision does not relate to a mere alteration in the terms of the contract, but to the final and complete termination of it. It would be idle to insist that some other provision of the contract, having application only to the time the contract is in existence, could in any way hinder, delay or defeat this provision for its termination.
In some of the earlier cases in this state members of this court have expressed a contrary opinion. In fact, as late as the case of the State of Ohio v. Boone, 84 Ohio St., 346, the judge writing the opinion expressed views in conflict with' the conclusion here announced. That case, however, was decided solely on the question of the constitutionality of the act then under consideration. ' That fact is clearly expressed in the syllabus. It has long been the rule of this court that the syllabus contains the law of the case. It is the only part of the opinion requiring the approval of all the members concurring in the judgment. Where the judge writing an opinion discusses maE ters or gives expression to his views on questions not contained in the syllabus, it is merely the per *108 sonal opinion of that judge. The judges concurring in the judgment and the law as announced in the syllabus are not required or expected to express their concurrence in or their dissent from matters merely obiter.
I do not know whether or not a majority of this court as then constituted concurred in the view expressed in the opinion in that case in relation to this subject, for the very good reason that the question was not presented by counsel either in oral argument or by briefs. Nor was it considered by the court in consultation prior to reaching, a decision of the case. I do happen to know, however, that some of the members'of this court did not concur therein, but as the law was held inválid because certain provisions of it were in conflict with the constitution of this state, and that fact clearly appearing in the syllabus, and there being no reference whatever in the syllabus to the Ordinance of 1787, it was not thought necessary to dissent from that portion of the opinion having no application whatever to the disposition of the case or to the law of the case announced in the syllabus.
This question is now presented by the record and briefs in this case, and must be determined one way or the other. It appears, however, that, not only the courts of every other state comprised within the Northwest Territory, but also the supréme court of the United States, have fully disposed of this controversy. In the case of Escanaba Co. v. Chicago, 107 U. S., 678-688, it was. held by the supreme court of the United States in. reference to Illinois that “Whatever the limitation *109 upon her powers as a government whilst in a territorial condition, whether from the Ordinance of 1787 or the legislation of congress, it ceased to have any operative force, except as voluntarily adopted by her after she became a state of the Union.”
In the case of Coyle v. Oklahoma, 221 U. S., 559, Mr. Justice Lurton referred with approval to the doctrine announced by Mr, Justice Field in the case of Escanaba Co. v. Chicago, supra, and cited in support thereof the case of Pollard’s Lessee v. Hagan, 3 How., 212; Permoli v. First Municipality, 3 How., 589; Strader v. Graham, 10 How., 82. However, the most important part of the decision in the case of Coyle v. Oklahoma is found in the second, third and fourth paragraphs of the syllabus, the effect of which is that congress has no power to admit a state to the Union under restrictions which render it unequal to other states, or to deprive a state, when admitted, of any attribute of power essential to its equality with the other states.
In the case of Pollard’s Lessee v. Hagan, 3 How., 212, it was held in substance that “When a new state is admitted into the Union it is so admitted with all the powers of sovereignty and jurisdiction which pertain to the original states, and that equality of constitutional right and power is the condition of all the states of the Union, old and new.”
In the case of La Plaisance Harbor Co. v. City of Monroe, Walker’s Ch., 155, it was held by the supreme court of Michigan that “The Ordinance of 1787, for the government of the Territory of *110 the United States northwest of the river Ohio, is no part of the fundamental law of the state, since its admission into the Union. It was then superseded by the state constitution; and such parts of it as are not to be found in the federal or state constitution, were then annulled by mutual consent.”
The same conclusion is reached in the cases of Van Brocklin v. Tennessee, 117 U. S., 151-159; Sands v. Manistee River Improvement Co., 123 U. S., 288, 295-296; Willamette Iron Bridge Co. v. Hatch, 125 U. S., 1, 9-10; People, ex rel., v. Thompson, 155 Ill., 451; Depew v. Canal Trustees, 5 Ind.; 8; Conn. Mutl. Life Ins. Co. v. Cross, 18 Wis., 109.
It appears after diligent search that upon this question there is no conflict of authority, either state or federal. Ohio is the only state affected thereby in which the courts have even intimated a doubt in reference thereto. Elsewhere the authorities are uniform in support of the proposition that the Ordinance of 1787 was entirely superseded by the respective constitutions of the several states, carved out of this territory, when such states were admitted into the Union. Any other construction would lead to the conclusion that the states of the Northwest Territory are restricted and limited by provisions other than those contained in the federal constitution and thereby deprived of power essential to their equality with the other states.
The right of the general assembly to levy this tax for state purposes depends upon whether the purposes of' the levy are state purposes. That *111 the state has the power to build and maintain highways seems never to have been doubted in Ohio. Early in the history of this state the legislature provided by law for the establishment of state roads, and by law appointed commissioners or viewers to select the routes and award damages. Numerous statutes of this character were passed, but it is sufficient to call’attention to one as showing the nature of this legislation. In the twenty-ninth volume of Ohio Laws, page 115 of the appendix, is an act that provides for the opening up and establishment of several state roads, one passing through Brown, Adams and Highland counties; another in Stark county; another through Gallia and Jackson counties; another through Hancock and Hardin counties; another through Wayne and Holmes counties; another through Sandusky and Hancock counties; another through Huron and Seneca counties; another through Monroe and Washington counties.
On the 4th day of February, 1831, the general assembly of Ohio passed an act providing that, with the consent of congress, Ohio would take under its care that portion of the National Pike within the limits of the state. It was held in the case of C., W. & Z. Rd. Co. v. Commissioners, 1 Ohio St., 77, 96, that the state having the power, to provide for the construction of such work directly it has the power to attain the same end through the subordinate agencies. That the state has the right, the power and authority to construct highways, canals and other internal improvements is no longer an open question in Ohio. It follows that if the construction and maintenance of high *112 ways come within the scope of legislative authority, then the legislature has the right to choose the means and methods it will employ to accomplish such purposes. It cannot be doubted that it is a wise public policy to commit to local control all matters .purely local, but the highways of the state are of more than local concern, and the state has too long delayed an effective supervision over them. That the important highways cannot be uniformly maintained by local authorities, under the old order of things, is apparent to every observing individual. Local authorities differ in their judgment as to the character and quality of roads required for public travel. It avails but little to the people of the state if main highways or main market roads are constructed and improved by patchwork. New and more rapid means of travel have emphasized the importance of proper highways and created a demand for uniform and intelligent construction and maintenance of roads.
Judge Ranney in the case of Railroad Co. v. Commissioners, supra, uses language that is peculiarly appropriate to the present condition of affairs. Among other things, he said: “It is true that in early times only wagon and turnpike roads were constructed; but it would be strange imbecility to fasten upon government, to deny it, in the attainment of the same ends, the use of such improvements as science and discovery have brought within its reach.” At this particular time science and discovery have placed new, rapid and practical means of travel and transportation within our reach, but the advantages and efficiency of these discoveries depend largely upon the condi *113 tion of our highways. When travel by highways was slow and laborious at best, the condition of our highways may not have been of such grave concern to the state at large, but with the ¿dvent of vehicles driven by mechanical power, capable of bearing heavy burdens at a rapid speed, came the necessity of providing roads for such vehicles; otherwise they are practically useless. Heretofore market roads meant no more than the carrying of the products of farms to the nearest market. With the development of motor trucks came not only the possibility but the probability of transportation of all character of products to the consumer, not only from the farms but from the factories of our state. As a means of transporting passengers gas-motor vehicles are now competing with steam and electric railroads, and beyond all question they have already become the favorite pleasure vehicle of our people. This necessity for good roads must be met and mastered by some means and methods other than those employed in the past; otherwise the language of Judge Ranney becomes a prophesy and the time has arrived when a “strange imbecility” would deny to our people “the use of such improvements as science and discovery have brought within our reach.”
The right of the state to grant to corporations organized for rapid transportation of passengers and freight the power of eminent domain rests upon the basic principle that these lines of transportation are quasi-public highways for the use, advantage and convenience of the public. It follows, therefore, that the state has the inherent power not only to build and maintain highways, *114 but the right of eminent domain to appropriate private property to this public use; otherwise it could not confer such authority upon private corporations. We are of the opinion therefore that there are no constitutional objections to the state of Ohio constructing and maintaining highways of this state, either directly or with the aid of the local political subdivisions of the state. The right to choose the methods by which this important purpose shall be accomplished is vested in the legislative authority of the state.
It is further claimed that this act is not of uniform operation throughout the state, but it is apparent from the language of the act itself that this contention cannot be sustained. It provides a uniform levy upon all property in the state for the purpose named in the act itself. The argument of counsel, however, proceeds rather upon the question of the constitutionaity of other laws relating t® the distribution and expenditure of this money.
If perchance other laws in relation to the disbursement of the fund so raised, for the purpose for which it was levied, are unconstitutional, nevertheless the levy must stand, leaving it to the legislature to provide constitutional ways and means by which the fund may be applied to the object named in the statutes. The act of the general assembly levying this tax is a valid and constitutional exercise of the authority of the general assembly of Ohio to provide revenue for state purposes.

Peremptory writ allowed.

*115 Nichols, C. J., Johnson, Newman and Wilkin, JJ., concur.