J. R. Swan, J.,
concurring. This case involves an inquiry as to the status or condition of a slave, under the Constitution and [689 laws of Ohio, who is sent into this state to perform here menial services for his master. Upon this part of the case, I desire to state the reasons which induce me to concur in the opinion of the majority of the court.
Some states deem it good policy to subjugate one class of their people to the other, thus creating obligations on the part of the ruling class as to support and treatment, and forming a government for the subjugated class, in respect to services, very similar to that which usually exists between man and his domestic ■ animals. In such states the government or law of the subjugated class is the will of the master, who appropriates the fruits of labor to his own use, and sells, or otherwise disposes of his fellow. This is slavery *640 or property,in men. It has never existed in Ohio. It is against our policy, not only because it is a violation of the rights of man, and destroys all manliness, but because it brings a servile and degraded class into competition with mechanics and free laborers, who require higher compensation than the ordinary hire of slaves; bc< ause it creates a ruling class, the adjunct of wealth, whose position controls, and whose habits deprave public opinion, by making idleness respected, and labor the associate and the emblem of servility and degradation; thus sapping the very foundation of the virtue, wealth, and power of the state, by driving out the middle class — the mechanics and yeomanry of manly pride and enterprise — who are too poor to be masters; and dooming the poor and the ignorant who remain, to a base position, social, “and even political, little better than fellowship with slaves.
Our policy in regard to an institution so unjust, and so fraught with disaster to the great mass of a free and enterprising people, has not been left to the discretion of the legislature or the courts. Both are concluded by the express terms of our organic law. That 040] declares, what is in ^'accordance with reason and justice, the freedom of all men. It further declares that freedom to be the natural and inalienable right of all men. Thus:
“Art. I, Seo. 1. All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property.”
And as if to surround with further safeguards these jn’inciples and our own policy, the following provision was incorporated into our constitution, and is equally emphatic:
“Art. I, Seo. 6. There shall be no slavery in this state, nor involuntary servitude, unless for the punishment of crime.”
With these provisions in our constitution, it can not be matter of inquiry what our policy is in regard to slavery. It is very clear that slavery could not exist anywhere if our constitution had universal operation.
Now, conceding that neither the constitution of the United States, nor international law, nor the law of comity, interferes with these provisions of our constitution, and that the slave systems of other states and nations have no operation or effect whatever, beyond their own territorial limits, it is too clear to admit of doubt, and has not, I believe, been questioned, that these provisions of our consti *641, 642 •tution would operate upon the status or condition of every man, tho moment he came within the territorial limits of our state; and that whatever may have been his condition, as serf in Eussia, or slave in Africa, or elsewhere, their slave laws must at once yield to our ■constitution, and that those slave laws could not, either absolutely or in a modified form, fix the status of any man, or suspend in any degree, tho operation of our own constitution within our own limits.
That the constitution of 1802, which contained similar provisions, acted, when it operated at all, directly on the *status [041 of a slave, sent here voluntarily by his master, dissolving the relation, and terminating the claims of the master existing- under tho law of the country whence the slave came, has been uniformly held, and without question, ever since tho existence of the state. Such also was the effect given to the ordinance of 1787; and it could not be otherwise. Sommersett’s case, decided in 1772, was recognized, and is still recognized, as the true exposition of the common law; and, with a view to it, the ordinance and our constitutions were adopted. I shall have occasion hereafter to state what was decided in the Sommorsctt case.
This effect of our constitution upon the status of slaves, within ■our limits by the consent of the master, has been constantly applied by the judges and courts of this state from year to year, and has been so uniform and unquestioned, and met with such entire acquiescence, that the Supreme Court of this state have never had occasion to report a decision upon it. And there is no hardship in the operation of our constitution in this respect. Its effect is as well understood on the south as on the north side of the Ohio river. If a master voluntarily places his slave in a situation which works his manumission, it is in every respect as much his own voluntary act as the execution of a deed of manumission.
In the case of Dred Scott v. Sandford, 19 How. 590, 591, the various modes in which the laws of states and nations who do not recognize slavery, operate upon slaves, are classified by Mr. Justice Curtis, and the decisions of their courts are ably reviewed. Tho result is, that each nation, and the free states of tho United States, in some of which slavery existed, and is still temporarily allowed, have different municipal laws upon the subject; and the decisions of their courts as to the status of a slave and the rights *of [642 the master, are instructive precedents to us, just so far as our constitution and laws are identical with theirs.
*643 No rule of international law can, it is believed, interfere with the operation of our constitution in such case. Our policy and institutions in regard to slavery are too clear to admit of doubt. In the case of Prigg v. Commonwealth of Pennsylvania, 16 Pet. 611, Mr. Justice Story, in delivering the opinion of the court, says :
“ By the general law of nations, no nation is bound to recognize the state of slavery, as to foreign slaves found within its territorial dominions, when it is in opposition to its own policy and institutions, in favor of the subjects of other nations where slavery is recognized.”
I shall have occasion hereafter to cite some other authorities uj>on international law, bearing on this subject and the comity of states ; but I deem this sufficient and authoritative, as the principle here stated is too well settled to admit of question.
If, then, a slave is sent into this state to perform menial offices for his master, ho must by our law be deemed a free man, unless the constitution of the United States, or the municipal law of the state from whence he was sent, can operate upon his status here.
As to the constitution of the United States, it will be found, on examination, that its provisions, and the adjudications of the Supremo Court of the United States, have no application to the question before us.
It may be that the signs of the times require a recurrence to the great and well-settled landmarks which divide federal powor from state sovereignty; particularly to that fundamental provision of the constitution of the United States, which declares that “ The powers not delegated to the United States by the constitution, nor prohib 648] ited by it *to the states, are reserved to the states respectively, or to the people.” Amendments of 1789, Art. 10.
This provision leaves the states respectively in the full’ exercise of their sovereignty, except so far as the same is devolved upon the federal government. It limits and restrains the federal government to the exercise only of those powers which are delegated to it by the express terms of the constitution; and was undoubtedly inserted for the double purpose of asserting state sovereignty, and preventing the enlargement of the limited, powers of the federal government, by construction or otherwise.
It is conceded by the most licentious interpreters of federal power, that the states have, in general, entire and supreme control over the domestic relations of citizens, and that the federal govern *644 ment, in the absence of all express general power, has no jurisdiction whatever over the rights, obligations, or duties of parent and child, guardian and ward, or master and seiwant, in the several states of the Union.
On the other hand, any power delegated to the federal government by the constitution of the United States, in respect to these domestic relations, or any power over these domestic relations withheld from the states by the constitution, is of equally binding obligation.
There are obvious reasons for recurring to these old, familiar,, and well-established principles, which need not be stated.
In the formation of the federal constitution, the only provision which relates to the domestic relations of citizens, is the following: “No person held to service or labor in one state, under the law thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up, on claim of the party to whom such service or *labor may be due.” If this provision had been omitted, [6M each state could have made any law or regulation it deemed proper as to the reclamation of slaves escaping from one state into another'; and the interference of the federal government upon the-subject would have been a usurpation of power. But with this provision in the constitution, every state is prohibited from enacting any law whereby a fugitive from service, escaping from one state into another, shall be discharged. It has the same binding-obligation as any other provision of the constitution, and is in letter and spirit to be obeyed by,the people and every department of the government, state and national.
I repeat that this is the only provision in the constitution of the United States which relates to master and servant; and it is limited and restricted, by its own express terms, to certain specific cases. To bring a case within its provisions, and its prohibitions, of state law and regulations, the following facts must exist:
1. The person to be delivered up must be held to service under and by virtue of the laws of the state from which it is alleged that, ho escaped.
2. He must be claimed by the person to whom the service is due.
3. He must have escaped, that is, left the service of the claimant, without his consent.
What I have thus far said, is in accordance with the repeated. *645, 646 •decisions of tlie. courts of the United States, and of the several states. Thus, Chief Justice Taney, 19 How. 447, says: “ The principle upon which our governments rest, and upon which alone they continue to exist, is the union of states, sovereign and independent, within their own limits, in their internal and domestic concerns, and bound together as one people by a general government, 645] *possessing certain enumerated and restricted powers, delegated to it by the people of the several states.” In Groves v. Slaughter, 15 Pet. 508, the chief justice says : “ The power over this subject (slavery)'is exclusively with the several states; and each of them has a right to decide for itself, whether it will, or will not, allow persons of this description to be brought within its limits from another state, either for sale or for any other purpose ; -and also, to prescribe the manner and mode in which they may be' introduced, and to determine their condition and treatment within their respective territories; and the action of the several states upon this subject can not be controlled by Congress, either by virtue of its power to regulate commerce, or by virtue of any other power •conferred by the constitution of the United States.”
In Prigg v. The State of Pennsylvania, 16 Pet. 611: “ The state of slavery is deemed to be a more municipal regulation, founded upon and limited to the range of the territorial laws.” And the court further say: “ It is manifest from this consideration, that if the constitution had not contained the clause requiring the rendition of fugitives from labor, every non-slaveholding state in the Union would have been at liberty to have declared free all runaway slaves coming within its limits, and to have given them entire immunity and protection against the claims of their masters.” But it is unneeessary to multiply authorities upon this question.
Next, as to the scope of the provision of the constitution of the 'United States relating to fugitives.
In the case of Butler v. Hopper, 1 Wash. C. C. 499, it was hold by Mr. Justice Washington, in terms, that the provision in the constitution of the United States relating to fugitives does not “ extend to the case of a slave voluntarily earriod by his master into another 646] state, *and there leaving him under the protection of some law declaring him free.” The ease sustains the principle, that the claimant of a slave, to avail himself of the provisions of the consti tution and laws of the United States, must bring himself within their plain and obvious meaning; and that they will not be ex *647 tended by construction; and that the clause in the constitution is-confined to the case of a slave escaping from one state and fleeing to another. So, in Ex parte Simmons, 4 Wash. C. C. 396, the same eminent judge held that both the constitution and laws of the United States apply only to fugitives, and not to the case of a slave voluntarily brought by a master into another state. To the same effect is Commonwealth v. Holloway, 2 Serg. & Rawle, 305; Commonwealth v. Avis, 18 Pick. 222; Fields v. Walker, 23 Alabama, 155. And the same doctrine is stated in the case of Prigg v. Commonwealth of Pennsylvania, 16 Pet. 611.
It has been held that, inasmuch as this provision of the constitution, by its express terms, describes the source of the servitude of the person escaping, by the words, “ held to service or labor in one state, under the laws thereof,” the inquiry, whether the fugitive owes-service to the claimant, must be determined by the laws of the state from whence such fugitive escaped, and not by the laws of the state whore he is seized. It has also recently been held, in some of the slaveholding states, that whore the master has taken his slave to a free state, and the. slave has become a freeman by the laws of such free state, he still remains a slave if by force or otherwise he returns to the slaveholding state. And it has been further held, under this provision of the constitution, that if such freeman by the laws of one state, and a slave by the laws of the state of his original domicil, after returning or being returned to the slaveholding state, escapes to the state where by *law he is a freeman, he may bo re- [647 claimed by his master, under this provision of the constitution, as a fugitive slave; because ho is in fact, and under the laws of such slave-holding state, held to service and labor, and his status, by the terms-of the constitution, is determined by those laws. Now, if it were conceded that this is a fair and legitimate construction of the constitution of the United States, it can only be by force of its express-language.
It would be doing injustice to the motives and opinions of the Supreme Court of the United States to say that this conflict of law between a free and slaveholding state, as to the status or condition of a fugitive from labor, who is a freeman by the law of one state, and re-enslaved by the law of another, was determined by that court in favor of the law of servitude, on the ground tnat a free state, or its law upon this or any other subject, is subordinate to, or can be superseded by, the law of a slaveholding state. Oh the con *648 trary, the whole doctrine rests on the terms of the provision of the constitution to which I have referred; and the court hold that the constitution itself, by its own express terms, determines which of the conflicting laws of the two sovereignties shall, in the case of a fugitive from labor, settle the status or condition of the fugitive. The Supreme Court of the United States refuse to revise the judgments of the state courts when the laws of two states thus conflict as to the status of a man, having no jurisdiction over it, except in the case of fugitives. Strader et el v. Graham, 10 How. 82.
There is a numerous class of cases in the Supreme Court of the United States in which the court determine questions relating to the construction of the constitutions of the several states, thestatus •of persons in the several states, and the conflict of laws, but which decisions have not, and the Supreme Court do not claim that they 648] have, *any binding obligation upon the states of the Union, or the state tribunals. For instance, the suit now before us might have been brought in the courts of the United, States, the parties being citizens of different states. In determining whether the note sued upon was given for a valid consideration, the same questions •as to the status of Poindexter under our constitution and the laws pf Kentucky might have been presented, and the opinion of the court pronounced. The judgment of the court upon the note would have been conclusive between the parties to the action; but the determination of the court as to the status of Poindexter here or in Kentucky, or upon the construction of our constitution, would have •concluded nobody but the parties to the suit, and would have been entitled, in the state tribunals of Kentucky and Ohio, to the same •respect and consideration as the opinion of any-state court of tho Union, upon the same questions, composed of judges of equal ability and impartiality.
Whatever construction may be given by the Supreme Court of the United States to the constitutional provision relating to fugitives, whereby the laws of a free state are rendered inoperative, it grows out of, and is limited and restricted to, cases coming within that provision, and the force of its language in respect to escaping slaves.
While, therefore, the states of the Union have no power to pass any law which shall discharge a person owing service, and who has •escaped, and the right of the master to reclaim such person, is guaranteed by this provision of the constitution, the delegated pow *649, 650 •ers of the federal government upon this subject end here. If a slave has not escaped from his master, but is brought here or sent here by his master, his status or condition here must be determined, by the constitution of Ohio, or by the laws of Kentucky, *or [649 by the laws of comity of Ohio. Neither international law, nor the constitution of the United Stases, nor the decisions of the Supreme Court determines his status.
And first, as to the laws of Kentucky. It has been too often -determined to admit of cavil or question, that the laws of each state have no extra-territorial operation within the jurisdiction of another, except such as may be adopted by her laws ; and if, by comity, operation is given to the laws of such other state, they are no longer extra-territorial, but become thereby the municipal law of the state which adopts them.
This principle, and'its apjDlication to the case before us, may be illustrated, and my own views enforced, by referring to the conflicting laws of the free and slaveholding states of the Union, in relation to the status of persons within their limits.
Manumission in the slavoholding states, must, in general, take place by deed or writing. But there may be acts done by the master, which show as unequivocally an abandonment of his rights to the servitude of his slaves, as a deed of manumission.
It may now be considered as the settled doctrine of the .slave-holding states, that if the master takes his slave to a state where by law slavery can not exist, it must be coupled with such circumstances as show an abandonment, in fact, of the rights of servitude ; and the mere fact of a master taking his slave to such free state, does not, in general, work a manumission of -slaves, who, by force or otherwise, are brought back to a slave state. The laws of the free state in such cases, play a very subordinate part; for they must not only-be adopted and assented to by the master, but acts showing his adoption and assent to the operation of those laws must appear, otherwise they have no effect whatever upon the original or subsequent status *of slaves. Thus, if a master [656 hires out his slaves in a free state, although by the law of the free state they thereby become free, yet if by force, or otherwise, the master gets them under his control in the slave state, they are deemed slaves, and were never free. And the reason for this de•determination is, that by hiring them out temporarily, he showed *651 his intention to retain his dominion over them, and did not intend to permit the laws of the free state to operate upon them.
But if a master goes with his slave to reside for an indefinite period in a state where slavery is not tolerated, this, according to-the modern and well-settled principles of the slave system, operates as an act of manumission on the part of the master; not that the law of the foreign state propria vigore dissolved the relation of master and slave, but this act, and domicil of the master or coming to reside, is held to be sufficiently expressive of his consent that the slave should be free. 2 Marsh. (Ky.) 470; 14 Martin (La.), 401. Now this is not recognizing the force and effect, of the law of a free state, which declares that there shall be no slavery within her territorial limits; and which absolutely dissolves thc relation, and terminates the rights of the master existing under the law of the country from whence the parties came; for such law does not operate, in the state where it exists, through the master as an act of manumission, nor does it operate through the acquiescence of the master in the law or in the effect of the law; for it recognizes no master, and, to operate, is subordinate to no acquiescence. It propria vigore, dissolves and annuls the relation of master and slave. As a part of these adjudications in the slaveholding states, if the act of the master was not sufficiently expressive-of his consent and acquiescence in the operation of the law of the free state, so as to amount to an act of manumission under their 651] law *(and what acts are sufficient is determined differently in the different states), they further hold, that the law of freedom of the free state, had no effect whatever upon the original status of the slave taken there, except to suspend the rights of the master, only while the slave was a freeman under and by virtue of the laws of the free state. This last-mentioned rule also disregards the force and effect of the extra-territorial law of freedom, because extra-territorial; and is adopted on the ground that their own policy, in preserving intact their system of slavery, can not yield to the international law of comity. The laws of the free states are disregarded.
It need not, perhaps, be said that we can not'treat our own-constitution as extra-territorial and suspended by the laws of a foreign state.
The laws of Kentucky, therefore, and the adjudications of their-courts as to the force and effect of our laws, extra-territorially con *652 sidered, do not determine the status of Poindexter under our laws, administered within our own territory, when ho came into this state. But suppose we adopted them, mutatis mutandis, and'by them gave the same operation to our law which the slavcholding states give to their own, the effect would be this : The law of Ohio, like the law of each slaveholding state, determines and fixes the status or condition of a man within this state, and by that law ho is a freeman; and if afterward the status of such freeman is determined by the law of a foreign jurisdiction to be that of a slave, such extra-territorial law can have no force or effect, propria vigore, in determining the personal rights of such freeman, when those rights are the subject of inquiry under our own law, by our own tribunals. He is still a freeman by our law, and his personal rights are suspended merely, and not abrogated, while he remains in the foreign jurisdiction. And, in my opinion, *this is the law [652 of the present case, drawn, too, from a source which our sister slaveholding states can not gainsay.
But it may be said that whatever may be the operation of the law of Ohio upon the status of Poindexter while here, by returning to Kentucky voluntarily, and entering into negotiations afterward for his manumission, he thereby waived his right to freedom under the law of Ohio, and consented to his bondage under the law of Kentucky.
If his return to Kentucky had any operation upon his status_ it could take effect not on our own soil, or within our own limits; for, while here, he was still a slave or he was a freeman. If still a slave here, the whole question is disposed of by the law of Kentucky operating within'and becoming the municipal law of Ohio. If our law operated at all upon his status, it operated as our law operates upon every other person, instantaneously, when he came within our limits. He was denuded of the municipal law of Kentucky, and invested with the rights and subject to the obligations of our own law, when he passed the conterminous line of the two states. He was then free. Could he, by our law, afterward bo made a slave ? That he could, by the law of Kentucky, be again subjected to bondage is conceded; and it is done there, not by recognizing the force or effect of the extra-territorial law of Ohio, but by disregarding it, and holding that he was not a' freeman while in Ohio, but, in the language of the court of appeals of Kentucky, “the master submitted to a temporary suspension of his *653, 654 right, or rather of the legal means of coercion.” He was a freeman', however, by our law; and the question still remains, could he, by ■our law, be afterward made a slave ?
In Ohio, as I have already stated, the right to freedom is inalien■able. It is an old principle, instinct with meaning, born of the 658] revolution, and embodied into our constitution. *With the •constitution we might leave the question. But in the slaveholding states a man, once free, can not become a slave by agreement or •consent. His condition as a slave is fixed by descent, or by the violation of some municipal law. If Poindexter, by coming into Ohio by the consent of his master, was, by the law of Kentucky, a freeman, his voluntary return to Kentucky would not, by their law, have made him a slave. Once free, always free, except for the violation of law, is the rule there and herd? Rankin v. Lydia, 2 A. K. Marsh. 472. If the status of Poindexter, by coming within cur territorial limits by the consent of his master, and while here, was determined by our law; if the law of Kentucky and the rights and power of the master did hot here attach to him, and could not then be exercised, it is clear that no law of Kentucky, much less any law of Ohio, could afterward, by his voluntary return to Kentucky, or by any agreement, make him a slave. I can not state this principle in language more forcible and apt, than that used by the court of appeals of Kentucky upon the same ¡subject, in regard to their own law:
l:¥e are not aware of any law in this state which can or does 'bring into operation the right of slavery when once destroyed. It. •would be a construction without language to be construed; implication without any scrap of law written or unwritten, statutory or -common, from which the inference could be drawn to revive the right to a slave when that right had passed over to the slave him¡self, and he had become free.” Rankin v. Lydia, supra.
The most, perhaps, that can be said of the legal effect of the voluntary return of Poindexter to Kentucky is, that he thereby submitted temporarily to a suspension of his personal rights as a freeman, or rather of the legal means of asserting them.
*It has been asserted that the legal claims of the master are-•suspended merely by sending his slave to this state, under the circumstances detailed in this case; so, at least, it is said in Kentucky. I have already shown that this position is founded in Kentucky ;upon a disregard of the force and effect of the provisions of our *655 ■constitution, which being extra-territorial, is held to have no binding obligation there. And this position is also maintained in Kentucky, because, under it, they avoid the application of the principle that a freeman can not be enslaved. The rule, however, is commended to us for adoption, not to give operation to, but to avoid the express provisions of our constitution; to regard those provisions, in effect, as extra-territorial, and to introduce in their place the recognition of existing, but suspended slavery rights, under ■the municipal law of Kentucky, within our own territory. As Poindexter was not a slave by our constitution when he passed into our state, but free, the recognition of any suspended, or other claims ■of servitude resting upon his person, would be a contradiction of terms ; it would be holding that he whs still a slave; and the introduction, by the sanction of the court, of modified slavery, and a violation of the principles and the terms of the constitution of the state.
It may be said that slaves, being property, must, when sent or ■brought here by their masters, be treated as property, and protected like other property of foreigners, who are transiently within the state. This is quite a modern discovery in the application of international law.
The application of international law to property in slaves may be a proper subject for discussion when it shall be shown that the local, municipal law of a foreign state, creating an ownership in man, can be conveyed in itinere to another state, which by its own law destroys all such artificial ownership, and where its exercise is positively forbidden ; *that the law of personal rights in [655 ■one state or nation shall, in defiance of her own law and state ■sovereignty, be stricken down and become subordinate to -a municipal and local law of a foreign state, under a claim of property in those personal rights. These things can not be. No international law binds nations to sacrifice their own laws or policy to that of others. The rule on this subject can not be thus evaded : “ The ■state of slavery will not be recognized in any country whose institutions and policy prohibit slavery.” Story’s Confl., sec. 104. And what are the incidents of property in slaves, where none of the incidents of slavery will be recognized ?”
If slavery, as an institution, existed among all nations, the ruling class of all nations would probably find it for their interest to respect the domination of each other over the subjugated class, and *656 call ifc property. Indeed, property in slaves is but another name for the power of the master over the slave, armed by municipal law, to use him as the implement of his will; and the one can not be acknowledged without the introduction of the other — it is slavery and the slave system masked under the mild name of property. The distinction is without a difference.
The constitution of the United States regards and acts upon slaves as persons and not as property. “ Persons held to service “ the migration or importation of such persons as any of the states-now existing shall think proper to admit,” meaning, by this circumlocution, the slave trade; “ representatives and direct taxes shall be apportioned among the several states according to their respective numbers, which shall be determined by adding to the whole number of free persons, including those bound to service for a term of years, and excluding Indians not taxed, three-fifths of all other-persons” — meaning three-fifths of the slaves. There is nothing in 656] the constitution *of the United States taking from the states and delegating to the federal government, power over slaves as-property.
The Supreme Court of the United States, by holding that a slave-holding state could prohibit the introduction of slaves into it as merchandise, and for sale, have virtually decided the question. Groves et al. v. Slaughter, 15 Pet. 506.
As to the law of comity.
When a state adopts the law of a foreign state, by comity, she makes it a part of her own municipal law.
If such law relate to policy or institutions, the state adopting the foreign law, so far modifies and changes her policy or institutions. The adoption of such foreign law is an act of the state, not the courtesy of judges. It would be the highest exercise of legislative power, and usurpation of authority, for a court, out of regard for a foreign state or its institutions, to introduce, as an act of courtesy or comity,'a foreign law or institution, contravening the policy, laws, or institutions of a state.
We are called upon, in this case, to introduce into the municipal law of Ohio, as a matter of comity, so much of the slave laws of Hentucky as will recognize the coercive rights of the master in Ohio, and thus suspend the operation of our own constitution. We have no authority to do either. The municipal law which enforces *657, 658 the slavery of man to man, being condemned and forbidden by our constitution, we can not change, alter, or suspend it.
With entire respect, we must say to Kentucky, as was said to Ohio when disregarding our law upon this same subject, and I quote it because I believe it is the true doctrine of international law : “Comity does not require one state to violate its own laws or policy to enforce the laws of another.” Collins v. America, 9 B. Mon. 572, syl.
Suppose the legislature of Ohio should undertake to introduce slavery into Ohio in the mildest form, by enacting *that the [657 masters of slaves should have a right to bring their slaves here, temporarily, to work for their masters, or to do menial offices for them while the masters were in itinere, or on temporary visits, and that while so here, some or any coercive rights and domination over the slaves should be vested in the master by our law. If this would not be slavery existing within our limits, and sanctioned by our own law, what would it be? It is slavery, modified, to be sure, as compared with that of slaveholding states, but, nevertheless, ■slavery. Such a law would be a palpable violation of our own constitution, and void. And this court can not, on its own mere courtesy, suspend the operation of the constitution, disregard its terms, ■and announce as law what the legislature is forbidden to enact.
Before closing this opinion, it is proper to refer to some of the decisions of other states, which have been discussed in this case.
I have already stated that the ordinance of 1787, and the constitutions of 1802 and 1851, were made with a view to what was understood to be decided in the Sommersett case. I confess that I have always understood that slavery could not exist in England, and that such was the law before the decision of the Sommersett case. I think such is the general opinion now, both in England and in this country.
It has been suggested, however, that the decision turned not on the question whether slavery could exist in England, in the absence •of any positive law to uphold it, but that the only question decided, was, whether a slave, which was brought from Virginia, could bo held in custody to be taken to Jamaica to be sold. The ease was as follows:
“ Oh the 3d of December, 1771, affidavits were made by Thomas Walkin, Elizabeth Cade, and John Marlow, that James Sommersett, a negro, was confined in irons, *on board a ship called the [658 *659 Ann and Mary, John Knowles, commander, lying in the Thames, and bound for Jamaica; and Lord Mansfield, on an application,, supported by these affidavits; allowed a writ of habeas corpus,.! directed to Mr. Knowles, and requiring him to return the body of Sommersett before his lordship, with the cause of detainer.
“Mr. Knowles, on the 9th of December, produced the body of Sommersett before Lord Mansfield, and returned for cause of detainer, that Sommersett was the negro slave of Charles Steuart,. Esq., who had delivered Sommersett into Mr. Knowles’ custody, in order to carry him to Jamaica, and there sell him as a slave.. Affidavits were also made by Mr. Steuart, and two other gentlemen, to prove that Mr. Steuart had purchased Sommersett as a slave, in Virginia, and had afterward brought him into England, where he left his master’s service; and that his refusing to return was the occasion of his being carried on board Mr. Knowles’ ship.
“Lord Mansfield, choosing to refer the matter to the determination of the court of king’s bench, Sommersett, with sureties, was bound in the recognizance for his appearance there on the second day of the next Hilary term; and his lordship allowed till that day for settling the form of the return to the habeas corpus. Accordingly, on that day Sommersett appeared in the court of king’s bench, and then the following return was read: <1, John Knowles, commander of the vessel 'called the Ann and Mary, in the writ hereunto annexed, do most humbly certify and return to our present most serene sovereign, the king, that at the time, hereinafter mentioned, of bringing the said James Sommersett from Africa, and long before, there were, and from thence hitherto there have been and still are great numbers of negro slaves in Africa; and that during all the time aforesaid there hath been and still is a trade carried 65D] *on by his majesty’s subjects, from Africa to his majesty’s colonies or plantations of Virginia and Jamaica, in America, and other colonies or plantations belonging to his majesty in America, for the necessary supplying of the aforesaid colonies and plantations with negro slaves; and that negro slaves, brought in the course of the said trade from Africa to Vü’ginia and Jamaica aforesaid, and the said other colonies and plantations in America, by the laws of Virginia and Jamaica aforesaid, and the said other colonies and plantations in America, during all the time aforesaid, have been and are salable and sold as goods and chattels, and upon the sale thereof have become and been and are the slaves and property of the pur- *660 . chasers thereof, and have been and are salable and sold by the proprietors thereof as goods and chattels.
“ ! And I do further certify and return to our said lord the king, that James Sommersett, in the said writ hereunto annexed named, is a negro, and a native of Africa; and that the said James Sommersett, long before the coming of the said writ to me, to wit, on the 10th day of March, in the year of our Lord , was a negro-slave in Africa aforesaid, and afterward, to wit, on the same day and year last aforesaid, being such negro slave, was.brought in the course of the said trade, as a negro slave, from Africa aforesaid, toYirginia aforesaid, to be there sold; and afterward, to wit, on the 1st day of August, in the year last aforesaid, the said James Sommersett, being and continuing such negro slave, was sold ill Yirginia aforesaid, to one Charles Steuart, Esq., who thén was an inhabitant of Yirginia aforesaid; and that the said James Sommer.sett thereupon then and there became and was the negro slave and property of the said Charles Steuart, and hath not at any time since-been manumitted, enfranchised, set free, or discharged; and that the same J ames Sommersett, so being *the negro slave and [660 property of him, the said Charles Steuart, and the said CharlesSteuart having; occasion to transact certain affairs and business of him, the said Charles Steuart, before the coming of the said writ to me, to wit, on the 1st day of October, in the year of our Lord, 1769, departed from America aforesaid, on a voyage for this kingdom,.for the purpose of transacting his aforesaid affairs and business, and with an intention to return to America as soon as the said affairs- and business of him, the said Charles Steuart, in this kingdom, should be transacted; and afterward, to wit, on the 10th day of November, in the same year, arrived in this kingdom, to wit, London, that is to say, in the parish of St. Mary-le-Bow, in the ward of Cheap ; and that the said Charles Steuart brought the said James Sommersett, his negro slave and property, along with him, in the said voyage from America aforesaid, to this kingdom, as the negro slave-and property of him, the said Charles Steuart, to attend and serve him during his stay and abiding in this kingdom, on the occasion aforesaid, and with an intent to carry the said James Sommersett back again into America with him, the said Charles Steuart, when the said affairs and business of the said Charles Steuart should be transacted; which said affairs and business of the said Charles Steuart are not yet transacted; and the intention of *661, 662 tbe said Charles Steuart to return to America, as aforesaid, hath hitherto continued, and still continues. And I do further certify to' our said lord the king, that the said James Sommersett did accordingly attend and serve the said Charles Steuart in this kingdom, from the time of his said arrival until the said James Sommersett’s departing and absenting himself from the service of the said Charles, Steuart, hereinafter mentioned, to wit, at London aforesaid, in the 661] parish and ward ^aforesaid ; and that before the coming of this writ to me, to wit, on the 1st day of October, in the year of our Lord 1771, at London aforesaid, to wit, in the parish and ward aforesaid, the said James Sommersett, without the consent, and against the will of the said Charles Steuart, and without any lawful authority whatsoever, departed and absented himself from the service of the said Charles Steuart, and absolutely refused to return into the service of the said Charles Steuart, and serve the said Charles Steuart, during his stay and abiding in this kingdom, on the occasion aforesaid; whereupon the said Charles Steuart afterward and before the coming of this writ to me, to wit, on the 26th day of November, in the year of our Lord, 1771, on board the said vessel called the Ann and Mary, then and still lying in the river Thames, to wit, at London aforesaid, in the parish and ward aforesaid, and then and still bound upon a voyage for Jamaica aforesaid, did deliver the said James Sommersett unto me, who then was and yet am master and commander of the said vessel, to be by me safely and securely kept, and carried, and conveyed in the said vessel, in the said voyage to Jamaica aforesaid, to be there sold as the slave and propierty of the said Charles Steuart; and that I did tkereujDon then and there, to wit, at London aforesaid, in the parish and ward aforesaid, receive and take, and have ever since . kept and detained the said James Sommersett in my care and custody, to be carried by me in the said voyage to Jamaica aforesaid, for the purpose aforesaid. And this is the cause of my taking and detaining the said James Sommersett, whose body I have now ready, as by the said writ I am commanded.’
“After the reading of the return, Mr. Sergeant Davy, one of the counsel for Sommersett, the negro, desired time to prepare his argument against the return; and on account of the importance of the 662] case, the court postponed hearing *the objections against the return till the 7th of February, and the recognizance for the negro’s appearance was continued accordingly. On that day, Mr. Sergeant *663 Davy and Mr. Sergeant Glynn argued against the return, and the further argument was postponed till the Easter term, when Mr. Mansfield, Mr. Alleyne, and Mr. Hargrave were also hoard on the same side. Afterward, Mr. Wallace and Mr. Dunning argued in support of the return, and Mr. Sergeant Davy was hoard in reply to them. The determination of the court was suspended till the following Trinity term; and then the court was unanimously of opinion against the return, and ordered that Sommersett should be discharged.
“Lord Mansfield — The question is, if the owner had a right to detain the slave, for the sending of him over to be sold in Jamaica. In five or six cases of this nature, I have known it to be accommodated by agreement between the parties; on its first coming before me, I strongly recommended it here. But if the parties will have it decided, we must give our opinion. Compassion will not, on the ■one hand, nor inconvenience on the other, be to decide; but the law, in which the difficulty will bo, principally from the inconvenience on both sides. Contract for the sale of a slave is good here; the sale is a matter to which the law properly and readily attaches, .and will maintain the price according to the agreement. But here the person of the slave himself is immediately the object of inquiry; which makes a very material difference. The now question is, whether any dominion, authority, or coercion, can be exercised in this country, on a slave, according to the American laws? The difficulty of adopting the relation, without adopting it in all its consequences, is indeed extreme; and yet many of those consequences are absolutely contrary to the municipal law of England. We have no authority to ^regulate the conditions in which the law shall operate. On [668 the other hand, should we think the coercive power can not bo exercised: it is now about fifty years since the opinion given by two of the greatest men of their own, or any times (since which no contract has been brought to trial, between the masters and slaves), the service performed by the slaves without wages, is a clear indication they did not think themselves free by coming hither. The setting 14,000 or 15,000 men at once loose by a solemn opinion, is very disagreeable in the effects it threatens. There is a case in Hobart (Coventry and Woodfall), where a man had contracted to go as a mariner; but the now case will not come within that decision. Mr. Steuart advances no claims on contract; he rests the whole demand on a right to the negro as a slave, and mentions the *664 purpose of detainure to be tbe sending of him over to be sold in Jamaica. If the parties will have judgment, “fiat justitia, mat coelute;” let justice be done whatever be the consequence. £50 a head may not be a high price; then a loss fóllows to the proprietors of above £700^000 sterling. How would the law stand with respect to their settlement, their wages ? How many actions for any slight ciercion by the master? ¥e can not in any of these points direct the law; the law mtist rule us. In these particulars it may be matter of weighty consideration, what provisions are made or sot by law. Mr. Steuart may end the question, by discharging or giving freedom to the 'negro. I did think at first to put the matter to a more solemn way of argument; but if my brothers agree, there seems no occasion. T do not imagine, after the point has been discussed on both sides so extremely well, any new light could be thrown on the subject. If the parties choose to refer it to the common pleas, they can give themselves that satisfaction whenever 664] they think fit. An application to ^Parliament, if the merchants think the question of great.commercial concern, is the best, and porhaps the only method of settling the point for the future. The court is greatly obliged to the gentlemen of the bar who have spoke on the subject, and by whoso care and abilities so much has been effected, that the rule of decision will be reduced to a very easy compass. I can not omit to express particular happiness in seeing young men, just called to the bar, have been able so much to profit by their reading. I think it right the matter should stand over; and if we are called on for a decision, proper notice shall be given.”
“ Trinity Term, June 22,1772.
“ Lord Mansfield — On the part of Sommersett, the case which we gave notice should be decided this day the court now proceeds to give its opinion. I shall recite the return' to the writ of habeas corpus, as the ground of our determination; omitting only words of form.
“The captain of the ship on board of which the negro was taken, makes his return to the writ in terms signifying that there have been, and still are, slaves to a great number in Africa; and that the trade in them is authorized by the laws and opinions of Virginia, and Jamaica; that they are goods and chattels; and, as such salable and sold. That James Sommersett is a negro of Africa, and long before the return of the king’s writ, was brought to be sold, *665, 666 and was sold to Charles Steuart, Esq., then in Jamaica, and has not been manumitted since; that Mr. Steuart, having occasion to transact business, came over hither with an intention to return, and brought Sommersett to attend and abide with him, and to carry him back as soon as the business should be transacted. -That such intention has been, and still continues; and that the negro did remain until the time of his departure, in the service of his master, Mr. Steuart, and quitted it without his consent; and thereupon, ^before the return of the king’s writ, thé said Charles Steu- [665 art did commit the slave on board the Ann and Mary, to safe custody, to be kept till he should set sail, and then to be taken with him to Jamaica, and there sold as a slave. And this is the cause why he, Captain Knowles, who was then, ana now is, commander of the above vessel, then and now lying in the river Thames, did the said negro, committed to his custody, detain ; and on which he now renders him to the orders of the court. We pay all duo attention to the opinion of Sir Philip Yorko and Lord Chancellor Talbot, whereby they pledged themselves to the British ¡banters,, for all the legal consequences of slaves coming over to this kingdom, or being- baptized, recognized by Lord Hardwicke, sitting as-chancellor, on the 19th of October, 1749, that trover would lie ; that a notion had prevailed, if a negro came over, or became a Christian, he was emancipated, but no ground in law; that' he and Lord Talbot, when attorney and solicitor-general, were of opinion that no-such claim for freedom was valid; that though the statute of tenures-had abolished villeins regardant to a manor, yet he did not conceive but that a man might still become a villein in gross, by confessing himself such in open court. We are so well agreed, that we think there is no occasion of having it argued (as .1 intimated an intention at first) before all the judges, as is usual, for obvious reasons, on a return to a habeas corpus. The only question before us is, whether the cause on the return is sufficient ? If it is, the negro must be remanded; if it is not, he must be discharged. Accordingly, the return states, that the slave departed and refused to serve; whereupon he was kept to be sold abroad. So high an act of dominion must bo recognized by the law of the country where it is used. The power of a master over his slave has been extremely different in different countries. The state of slavery is of such *a na- [666-ture, that it is incapable of being introduced on any reasons, moral or political, but only by positive law, which preserves its force long *667 .after the reasons, occasions, and time itself from whence it was •created, or erased from memory. It is so odious that nothing can .be suffered to support it, but positive law.
“ Whatever inconveniences, therefore, may follow from the de■cision, I can not say this case is allowed or approved,by the law of England ; and therefore the black must be discharged.” 20 State ‘Trials, 2.
Ever since 1772, and until very recently, it was, I believe, supposed, both in England and in this country, that the Sommersett •case decided, among others, these three propositions :
1. That slavery can not be introduced ; nor can anything be suffered to support it but jDositive law.
2. That no such positive law, authorizing it, existed in England. ’The nearest approach to it was a villein in gross confessing himself such in open court.
3. That if a master takes his slave to England, not for the purpose of domicil, but even temporarily, to transact business, and with an intention to return, the slave is, by the law of England, free.
These propositions were deemed settled by the Sommersett case from 1772 until very recently. It is now insisted that the decision •of Lord Mansfield was, only, that so high an act of dominion as the master exercises over his slave, in sending him, abroad for sale, could not be exercised in England under the American laws, and was -contrary to the spirit of their own. And so, under the limitation of the extent of this decision, Sommersett would have been deemed .a slave under the common law of England, and the local law of slavery would have been held by Lord Mansfield operative in 667] ♦England, in that case, if Mr. Steuart had intended to take .Sommersett to Virginia, to serve him, instead of to Jamaica to sell.
Undoubtedly, Lord Mansfield did decide what is claimed, and if •this had been all, the case would not have been worth reporting, even for the gratification of those who felt a personal interest in .Sommersett’s discharge. There were two questions made by counsel, and they were very distinctly stated by Lord Mansfield, at a previous term, when the case was adjourned over for argument: the one which it is claimed to be the only one decided, and the •other which is thus stated by Lord Mansfield : “ The now question is, whether any dominion, authority, or coercion can be exercised in this country on a slave, according to the Amei'ican laws?” And it will be seen, from the final decision of Lord Mansfield, the whole *668 of which I have given, decides not only that a slave can not be kept in custody for the purpose of being taken to a slave colony of England, but that the state of slavery is of such a nature, and so odious, that it can not exist at all in England, in the absence-of any positive law to sanction or sustain it. That such was the-scope of the decision, as understood in England, is' manifest from the case of Forbes v. Cochrane, 9 Eng. C. L. 146, and from what is-stated by every English elementary writer that I have been able to-consult, who has written on the subject since 1772.
That such also was the scope of the decision as understood in this-country when Mr. Justice Story wrote his work on the conflict of laws, is also manifest. After stating that there is a uniformity of opinion among foreign jurists and foreign tribunals, that no effect whatever is to be given in one country to the slave system of another, he says: “ This is also the undisputed law of England. It has been solemnly decided, that the law of England abhors and will *not endure the existence of slavery within the nation ; and, [668 consequently, as soon as a slave lands in England, he becomes, ipso’ facto, a freeman, and discharged from a state of servitude.” Story’s Confl. Laws, see. 99.
These new views of the Sommersett- case and of the English common law, which I conceive emasculate the principle, as decided by that case, and as well. understood by the generations which have preceded us, come too late to change the settled construction of the-organic law of Ohio, which has matured by age, and is now quite-beyond the nursing care of English tutelage, or any new interpretation of English precedents.
Before the decision in the Sommersett case was made, Blackstone’s Commentaries were written. He had said : “ The spirit of liberty is so deeply implanted in our constitution, and rooted in our-very soil, that a slave, or a negro, the moment he lands in England, falls under the protection of the laws, and so far becomes a freeman ; though the master’s right to his services may possibly still continue.” 1 Wend. Bla. 127. The following note by Christian, is appended to the text: “ By the case of the negro Sommersett,. and that of Forbes v. Cochrane, 2 B. & C. 448, this great principle of English law was declared to extend beyond the limits laid down by Blackstone. The former case established not only that slaves,, when brought into England, become free, but that when seized and-imprisoned on board a ship, with a view to be again enslaved, they *669, 670 .are entitled, equally with any other British subject, to a writ of habeas corpus, to restore them to freedom. In Forbes v. Cochrane, it was held, that the piaster of slaves, who had escaped from slavery in East Florida, where ¡slavery was lawful, could maintain no action in our courts agaidst a British subject, who had harbored them after their escape. The moment, said Chief Justice Best, they 660] *put their feet .pn board a British man-of-war, not being within the waters of East.Florida (where, undoubtedly, the law of that country would prevail),-those persons who before had been slaves, are free.”
Blackstone’s text, as modified by the subsequent decision in the .Sommersett case, at least as understood by the annotator, does not leave much ground to doubt the status of a slave in England.
Again, the remark of Blackstone (1 Wend. Bla. 424, 425) has been cited for the purpose of showing that, before the decision of the Sommersett case, “ any rights of the master, lawfully acquired,” will be protected, and that “ whatever service the heathen negro ■ owed of right to his American master by general, not by local law, the same (whatever it be) is he bound to rende! when brought to England and made a Christian.” I leave these remarks, also of Blackstone, to his annotators, who say: “This doctrine, which the learned author has already laid down (supra, page 127), the master’s right to the service of the negro may possibly still continue .after the state of slavery has been cast off, is here also expressed in very guarded terms, to wit, to extend only to the service, (to which the master may have lawfully acquired a right,’ or which the heathen negro 1 owed of right to his master by general law.’ ” With regard to the latter, Blackstone has already shown that the exist•ence of such a right is repugnant to reason and natural law; and with regard to the former, Mr. Christian well observes that a contract of service made by a person in a state of slavery' must be absolutely null and void. But the statutes 3 and 4 William, etc., having abolished slavery throughout the British colonies, a negro can owe no other service.to his master than would be duo, under similar circumstances, from any Other person. It can hardly be 670] claimed that these guarded expressions of *Blackstone, made before the decision of the Sommersett case, could shake the authority of that case, or overthrow the law of England ; much less •change the law of Ohio, as settled ever since its organization.
We have not had access to the 2 Hagg. Adm Reports, in which is *671 reported the case of the slave Grace. The statement, however, of the scope of that case (and which has been so much relied upon in this case), may be trusted with confidence to Mr. Justice M;Lean,. who says: “In coming to the conclusion that a voluntary return by Grace to her former domicil, slavery attached, Lord Stowell took great pains to show that England forced slavery upon her colonics, and that it was maintained by numerous acts of Parliament and public policy; and, in short, that the system of slavery was not only established by Great Britain in her West Indian colonies, but that it was popular and profitable to many of the wealthy and influential people of England, who were engaged in trade, or owned and cultivated plantations in the colonies. No one can read his elaborate views and not be struck with the great difference between Eng-, land and her colonies, and the free and slave states of this Union. While slavery in the colonies of England is subject to the power of the mother country, our states, especially in regard to slavery, are independent, resting upon their own sovereignties, and subject only to international laws which apply to independent states.” 19 How. 560. It would seem, therefore, that if there were no express prohibition against slavery in Ohio, and no law authorizing it within the limits of the state, as in England, and if Kentucky stood in the relation of a colony, in which laws had been enacted by this state maintaining slavery there, and its public policy, the case of the slave Grace would be an authority in favor of holding that the return of Poindexter* to Kentucky reinstated him, under our ^colonial system, in his original condition of slave. ' I should [671 hardly deem this court justified in following such a decision, and thus changing the effect of our own constitution, and making it produce upon the status of a slave while here, what it is said Lord Stowell styles in that case “ a paren thesis!” 19 How. 591.
Slavery is not authorized in England, but it is not by positive law forbidden. The same is the case in some of the free states of this Union. Our constitution positively prohibits it. The difference is- material and important.
States which do not authorize, and do not expressly by law prohibit it; states which, in the language of Story, J., in respect to Massachusetts, “do not recognize it as legal;” or in which a slave ceases to be such, “only because there is no law which .sanctions his detention in slavery;” as Holroyd, J. (9 Eng. C. L. 144), says, the law of England operates in respect to a slave ceasing to be such *672 there; — such states may be passive, and adopt any practical rule they may deem expedient, consistent with the non-recognition of slavery under their laws. On the other hand, a state that prohibits it does not leave the existence of the institution or its recognition to public policy', its justice or injustice, nor to a mere non-recognition of it as inconsistent with its municipal law. The positive prohibition becomes an active, opei’ating, ruling principio, and not a parenthesis'. It strikes down and destroys; for it cannot retire, to give-place and become subordinate to a local law of another state, confessedly held, among all jurists, strictly territorial, and clearly in contravention of such positive prohibition. It does not await theenforcemcnt or the application of its principle to judicial decision. It operates at once, and by its own force and efficacy. And it is in disregard of this difference between the laws of free states that cases, and the dicta of judges are cited from England and Massachusetts, 672] *and other states, as though they were applicable to our own-express constitutional prohibition.
It is supposed that the law of nations as to the slave trade, has some application to the rights of Kentucky and the power of Ohio-upon the subject under consideration. The ocean being the highway of all nations, the municipal laws of states have no territorial operation over each other upon the high seas. Traffic in slaves was-, once deemed a lawful trade by all nations, and therefore protected by the law of nations. And on this account it was, that Great Britain and the United States, together with most of the civilized nations of the world, by treaty, declared the slave trade, in respect to their own subjects, piracy. The subjects of Great Britain and the United States undertook to seize and condemn, as for piracy, the ships of nations who had not entered into these stipulations for-the modification of the law of nations, and the courts of these two countries held that this could not be done, and that man-stealing, odious as it was, having been once deemed lawful by the only law which could operate on the high seas, the nations who had not entered into these treaty stipulations had a right to claim its protection. These decisions are cited for the purpose of showing that a trade, odious to the civilized world, is, notwithstanding, under the protection of the law of nations. Now, if Great Britain or the United States had no power to prevent man-stealing by other nations, within their own territorial limits, because it would contravene the law of nations, I should be able to perceive the application of these *673, 674 decisions to the case before us, for it would .show that no state can pass any law operating within its own territory which contravenes the law of nations applicable to the high seas. But it would be unfair to suppose the law of nations relating to the slave trade was referred to for the purpose of establishing any such *absurd [673 proposition. If, however, these cases are cited, as in Commonwealth v. Aves, 18 Pick. 216, by Chief Justice Shaw, for the purpose of showing, by way of argument, that a suit brought here upon a- note of hand, given in a state where slavery was allowed, for the price of a slave, might be maintainable here, I concede it is a forcible argument to prove what Mr. Justice Story doubts to be law (3 Story’s Confl. Laws, 4th ed., sec. 259, note); but if law, its application to' this case is not apprehended. Sustaining’ an action here on such a note, would be by comity recognizing the lex loci contractus — not slavery within our territorial limits. But what I protest against is,, the assumption that if slavery exists anywhere, and if by the laws-of any place a property can be acquired in men, the municipal local law of slavery shall extend, by international law relating to domicil, to every place where such men may be carried.
This position assumes, first, that the local law can change a man. into a commodity and personal property generally.
No doubt it can declare that slaves shall be deemed property, and that the relation and laws of personal chattels shall be deemed to-apply to them. But, as Chief Justice Shaw remarks, in the above case, “ It would be a perversion of terms to say, that such local laws do, in fact, make them personal property generally; they can only determine that the same rules of law shall apply to them as-are applicable to property.” After thus changing a man into a commodity and personal property by force of a law operating only within its own locality, the position further assumes, that master and slave can, by going into a free state, carry with them this local law of transmutation of a man into property. It is then assumed that international law, when it mentions property, does not mean commodities which are by all nations treated as property, but anything is property *by the law of nations, to which any state [614 may apply the artificial relations-of property by its local law.
It goes further, and assumes, that as property means men made gbods by local law, the rule of international law, recognized by the-civil law throughout Europe and in this country, can be evaded and successfully annulled, which declares that slavery can exist *675 ■only within the territory where it is established, and that if a slave ■escapes, or is carried beyond such territory, his master can not reclaim him, unless by virtue of express stipulation. 19 How. 534, per McLean, J., and authorities cited. Having thus assumed, in .violation of these principles of international law, and without any .authority whatever, that men are property everywhere by the law •of nations, because made so by the local law of a state, .it further assumes that the very innocent rule of international law, which declares that the property of a foreigner, not domiciled, is governed ■by the law of his domicile, is applicable to slaves; and hence, a master of slaves, temporarily residing in England, or France, or Ohio, may hold and exercise dominion' over his slaves during his temporary residence, because they are property. These positions need no answer. The law of nations recognizes no slavery or property in slaves within the territorial limits of each other. The law of states where slavery is prohibited, or not sanctioned, recognizes neither slavery nor property in slaves within their own territorial limits. I venture to say, that no respectable writer upon the law of nations can be found intimating any such doctrine. If it were so, then a Greek or Asiatic, held in slavery in Turkey, would, on his arrival in Europe or Ohio, be deemed a slave, and there subject to be treated as mere property; and this, too, in contravention •of the laws of England and Ohio.
Poindexter, upon his return to Kentucky, was a slave by the law 675] of that state.' To relieve himself from this ^condition, he ■entered into a contract for his manumission, and executed notes as ■principal, with sureties. By the law of Kentucky this contract •was not obligatory upon the master. But if it were, the question is l’aised, whether his condition, must not be treated in our courts as that of a free man under duress, or whether the law of the place >of the contract must not be applied, and his relief from the opera-lion of the law of Kentucky upon his condition, held to be a sufficient consideration for a compromise. I do not deem it necessary to express an opinion upon these questions, inasmuch as, under the .law of Kentucky, I do not see how they can ever practically arise.
Scott, J., concurred.